## UNITED STATES v. 154 SACKS OF OATS.

(District Court, W. D. Virginia. October 20, 1922.)

**Food ☞24—Oats containing 23 per cent. of foreign material, part of which was commercial wild oats intentionally admixed, forfeited.**

Where oats shipped in interstate commerce contained 23 per cent. of foreign material, a percentage of which was commercial wild oats which had been intentionally added, they were subject to forfeiture under Food and Drugs Act June 30, 1906 (Comp. St. §§ 8717–8728), notwithstanding that the oats were graded by an authorized inspector as sampled oats and so sold, and the Grain Standards Act Aug. 11, 1916, and Regulatory Announcements No. 46, §§ 1, 13, and 14, authorizing shipment of oats in their natural state containing as high as 25 per cent. of foreign material.

Proceeding for forfeiture by the United States against 154 Sacks of Oats. Forfeiture ordered.

H. E. McElwain, Jr., of Louisville, Ky., and Harper & Goodman, of Lynchburg, Va., for claimants.

L. P. Summers, U. S. Atty., of Abingdon, Va., and C. E. Gentry, Asst. U. S. Atty., of Charlottesville, Va.

McDOWELL, District Judge. This is a proceeding for forfeiture of a shipment of sample grade oats, made by the claimants in interstate commerce. The information charges that the oats had been adulterated (1) in that a substance had been mixed with them so as to reduce and injuriously affect their quality; (2) in that wild oats, weed seeds, chaff, and dust were mixed therewith in such manner as that the inferiority of the mixture was concealed; and (3) that the said oats had been misbranded.

The order establishing official grain standards for oats under the Grain Standards Act (see Service and Regulatory Announcements No. 46) contains, inter alia:

"Section 1. *Oats*—Oats shall be any grain which consists of cultivated oats, and not more than twenty-five per centum of foreign material, other grains and wild oats, either singly or in any combination."

. By section 13 oats are graded and designated as No. 1, No. 2, No. 3, No. 4, and sample grade. Among other requirements grade No. 1 must contain not less than 98 per cent. of sound cultivated oats; grade No. 2 not less than 95 per cent.; No. 3 not less than 90 per cent.; No. 4 not less than 80 per cent. Sample grade "shall be oats which do not come within the requirements of any of the grades from No. 1 to No. 4, inclusive, or which have any commercially objectionable foreign odor, or are sour, heating, hot, infested with live weevils or other insects injurious to stored grain, or are otherwise of distinctly low quality."

The facts have been stipulated, and in the stipulation appears the following:

"(10) It is agreed that the article in question contains 77 per cent. of cultivated oats and 23 per cent. of material other than cultivated oats. This 23 per cent. consists of wild oats, other grains, and foreign material, the foreign material consisting of weed seeds, chaff, and dust. A certain percentage of this 23 per cent. was added by the claimants, the material added being wild

oats. It is further agreed that there were present in the wild oats so added a certain percentage of other grains and foreign material, consisting of weed seeds, chaff, and dust, the quantity of said other grains and foreign material being no greater than that found in the average commercial shipment of wild oats.

"Generally, oats contain some foreign material as they come naturally from the field, and in the case of sample grade under the Grain Standards Act this amount may be as large as 25 per cent. The proportion of foreign material in the wild oats which was added by the claimant in this case was not greater than the proportion of foreign material in the cultivated oats with which they were mixed and the proportion of foreign material, viz. weed seeds, chaff, and dust was not greater in the mixture than the proportion thereof in either of the ingredients.

"(11) It is agreed that, based upon the pleadings in this case and the foregoing stipulation of fact, the following question of law is submitted to the court for determination:

"Does the shipment in interstate commerce as sample grade oats of an article prepared by the claimant as set forth in No. 10 hereof constitute a violation of the federal Food and Drugs Act (Comp. St. §§ 8717–8728), when such article has been previously graded as sample grade oats by a duly authorized inspector of the Bureau of Markets of the United States Department of Agriculture and sold as sample grade oats, a grade of the official grain standards for oats promulgated by the Secretary of Agriculture under the Grain Standards Act?"

The Grain Standards Act of August 11, 1916, c. 313 (39 Stats. 446, 482), does not seem to me to show an intent to repeal, alter, or modify the Food and Drugs Act of June 30, 1906, c. 3915 (36 Stats. 768) in any respect; nor an intent to authorize the Secretary of Agriculture so to do. But, if I am wrong in this respect, it seems too clear for argument that the Secretary of Agriculture in promulgating the standards for oats has not undertaken to modify the Food and Drugs Act in the slightest degree. Section 14 of the Service and Regulatory Announcements, No. 46, reads:

"Nothing herein shall be construed as authorizing the adulteration of oats by the addition of water, by the admixture of clippings or hulls, decomposed salvage oats, other grains, or any other foreign material, or otherwise, in violation of the Food and Drugs Act of June 30, 1906."

In the ingenious brief for the claimants the foregoing is characterized as a mere expression of opinion on a question of law on the part of the Secretary of Agriculture. It seems to me to be a very clear and explicit statement of the intent of the regulations. In other words, fearful that some one might fall into the error of thinking that the regulations were intended to modify the Food and Drugs Act, the Secretary expressly and definitely declares that such is not the intent of the regulations. Statements of intent and opinions as to legal effect, respectively, might conceivably be so expressed as to resemble each other, but in this case there is, I think, no room for confusion.

But, quite aside from anything that has been said, the regulations cannot fairly be read as modifying the Food and Drugs Act. Throughout the regulations there is no thought of authorizing such a thing as adulteration of oats. The regulations are drawn in recognition of the fact that some crops of oats, as harvested, contain greater proportions of foreign matter than others. While it is true (section 1) that oats containing more than 25 per cent. of foreign matter cannot legally be

graded as oats at all, there is nothing in the regulations that can fairly be construed as authorizing any one to adulterate oats. It is also true that oats, as they come in their natural condition from the thresher, are graded as sample oats, whether they contain 21 or 25 per cent. of foreign material. But this fact would not authorize any one to add 4 per cent. of weed seeds to oats that contained in their natural state only 21 per cent. of foreign matter. And the reason for so saying is that the Food and Drugs Act forbids such adulteration, and neither the Grain Standards Act nor the regulations repeal or modify the Food and Drugs Act.

Even if the regulations were sufficiently ambiguous to be read literally as authorizing any one to add wild oats and weed seeds to oats, any other fairly possible construction would properly be adopted, because of the wretched impolicy of permitting such an act. The fact that it is lawful to ship in interstate commerce oats containing in the natural state as high as 25 per cent. of weed seeds affords no sufficient reason for contending that it is also lawful to ship oats that have been artificially brought to this extreme state of impurity. This is so because the old law forbids the addition of impurities to foods, and the new law does not, either literally or in intention, repeal the old law.

It is argued that there is of necessity admixture in dealers' elevator bins of different carloads of "sample oats," of varying degrees of impurity. For instance, if a small car of oats containing as the oats came from the thresher 21 per cent. of foreign matter goes first into the empty bin, and next a small car of oats in like state containing 25 per cent. of foreign matter goes into the same bin, on drawing out a large carload from such bin the contents of the car will necessarily be an admixture, to some extent, of both the 21 per cent. and the 25 per cent. oats. And the infusion of the more impure oats will have been the result of an artificial mixing of the two lots of oats. However, this is not forbidden by the Food and Drugs Act. Both of the first two carloads put into the bin consist of sample grade oats; both are "articles of food." Neither carload is a "substance" within the meaning of section 7 of the Food and Drugs Act (Comp. St. § 8723). The only clause of section 7 that could even seemingly apply here is:

" * * * An article shall be deemed to be adulterated: * * * in the case of food: If any *substance* has been mixed or packed with *it* so as to reduce or lower or injuriously affect its quality or strength."

But obviously this language does not apply to the case supposed. The car which is 21 per cent. impure may legally be transported in interstate commerce, the car which is 25 per cent. impure may also be legally so transported; and no possible reason suggests itself for an intent to forbid the transportation of an admixture of the two, if sold for what it is. The result of a perfect admixture of 1,000 bushels of oats which are 21 per cent. impure and of 1,000 bushels of oats which are 25 per cent. impure would be 2,000 bushels of oats which are 23 per cent. impure. As each of the two ingredients is an article of food, no other "substance" has been mixed with an article of food. The reduction in the quality of one half of the mixture has been accompanied

by an exactly corresponding increase of the quality of the other half of the mixture. I can see no reason why any one should purposely make such a mixture, nor do I see why any one should be injured thereby. The difference between such mixture of two articles of food and a mixture of foreign matter (wild oats, weed seeds, chaff, and dust) with food is very clear. The first is harmlessly mixing two articles of food, the other is mixing a substance which is not a food with a food so as to injuriously affect the quality of the food.

In the case at bar the claimants did not mix two lots of sample oats together. They added wild oats, weed seeds, chaff and dust, to one lot of sample oats. In so doing they unquestionably adulterated a food.

It would of course be equally an unlawful adulteration to add wild oats, weed seed, chaff or dust to oats of any higher grade than sample oats, because it would be adding something that is not a food to a food so as to lower its quality.

It seems unnecessary to discuss at any length mixtures of sample grade oats with oats of higher grade. If a large quantity of sample oats were mixed with a small quantity of No. 1 oats, the result would be merely a food of lower grade than No. 1, and either of sample grade or of some grade between No. 1 and sample. There is no reason why this should not be done, and no reason why the mixture should not be transported in interstate commerce, assuming that it be honestly graded and branded for what it really is. Mixing two different grades of food is not mixing "a substance" with a food so as to lower the quality of the food. One of the ingredients (a food) has been lowered and the other (a food) has been correspondingly raised in quality, and no "substance," within the meaning of the Food and Drugs Act, has been mixed with either of the foods.

Counsel for claimant suggest the case of an admixture, purposely made, of oats and corn. If the corn was before the mixing in its natural condition and of a grade to be transported as a food, and if the oats were in their natural condition and of a grade to be transported as a food, and if the admixture resulted in any lawful grade of either corn or oats, I think that transportation of such mixture would not violate the Food and Drugs Act. If the corn were rotten, it would be a "substance" which could not be mixed with oats; but if the corn were of good food quality, it would be a food, and the mixture would also be a food, and no reason suggests itself for saying that the mixture could not be lawfully transported. As each ingredient separately was lawfully transportable, I see no reason why the mixture of the two ingredients should not also be lawfully transportable, if branded for what it is.

In the government brief it is said:

"Of the libel and amended libel filed the department intends to stand upon two principal allegations, to wit: That a substance has been substituted in part for the article, and that the article is misbranded, in that it was sold under the name of another article."

No amended information has been filed or offered. I suppose the intention to file such an amendment has been abandoned; but at any

rate I shall not act on an unexecuted intention. As the first ground for forfeiture set up in the only information that has ever been filed is, in my opinion, well taken, it is unnecessary that I consider the other two grounds.

An order declaring forfeiture may be taken