### UNITED STATES v. 154 SACKS OF OATS.

(District Court, W. D. Virginia, at Lynchburg. December 15, 1923.)

1. **Evidence** ⊙═13—**Common knowledge that wild oat plant is weed, and wild oats are not food.**

   It is common knowledge that generally the wild oat plant is regarded as a weed, in the sense that it is highly undesirable vegetation, and that the seed of the wild oat is not a food.

2. **Food** ⊙═15—**Mixture branded "sample grade star oats" held subject to forfeiture for misbranding.**

   Where an artificial or intentional mixture of oats contained 23 per cent. of foreign material, a percentage of which was wild oats, which had been intentionally added, branding the mixture "sample grade star oats" was a misbranding, subjecting it to forfeiture, under one of the misbranding clauses of the Food and Drugs Act (Comp. St. §§ 8717–8728), even assuming that the wild oat seed is a food, and that such brand was not deceptive, and notwithstanding that, under Grain Standards Act (Comp. St. §§ 8747½–8747½k) and Regulatory Announcement No. 46, a natural mixture containing the same ingredients in the same percentages could have been branded "sample grade oats."

3. **Food** ⊙═24—**In forfeiture proceedings for misbranding, burden on claimant to show unusual meaning of word in brand.**

   In forfeiture proceedings against certain sacks of oats, containing an artificial mixture of cultivated and wild oats, on theory that, by use of brand "sample grade star oats," they were offered for sale as a natural mixture, if the word "star" had some agreed meaning, which would give notice to a purchaser that the mixture was artificial, the burden was on claimant to show that fact.

4. **Estoppel** ⊙═62(2)—**United States not estopped from instituting forfeiture proceeding by acts of officer.**

   The government is not estopped from maintaining forfeiture proceedings against an intentional mixture of cultivated and wild oats by the acts of a licensed inspector in certifying the oats.

Forfeiture proceedings by the United States against 154 sacks of oats. Forfeiture ordered.

See, also, 283 Fed. 985.

⊙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

C. E. Gentry, Asst. U. S. Atty., of Charlottesville, Va.

H. E. McElwain, of Louisville, Ky., and Fred Harper, of Lynchburg, Va., for claimants.

McDOWELL, District Judge. On October 20, 1922, I made an order condemning the so-called oats here in question, and set forth the reason therefor in a published opinion. See U. S. v. 154 Sacks of Oats (D. C.) 283 Fed. 985. That order has, by joint request of counsel, not been executed, and since it was made an amended information has been filed, and also an additional stipulation, executed July 20, 1923, reading as follows:

"It is hereby stipulated between the parties hereto as follows:

"(1) That the questions presented for decision by the court under the amended information herein filed are (a) whether the article is adulterated, in that a substance was substituted in part for the article, and (b) misbranded, in that the article was sold under the distinctive name of another article.

"(2) That the allegations of the amended information filled herein shall be wholly disregarded, except in so far as they present the questions set out in (1) above."

The result of filing the amended information and this new stipulation is that the government abandons any possible grounds for forfeiture, except the two set out in the above-quoted stipulation. It will be convenient to here set out a part of the first stipulation of facts:

' "(10) It is agreed that the article in question contains 77 per cent. of cultivated oats and 23 per cent. of material other than cultivated oats. This 23 per cent. consists of wild oats, other grains, and foreign material, the foreign material consisting of weed seeds, chaff, and dust. A certain percentage of this 23 per cent. was added by the claimants, the material added being wild oats. It is further agreed that there was present in the wild oats so added a certain percentage of other grains and foreign material, consisting of weed seeds, chaff, and dust, the quantity of said other grains and foreign material being no greater than that found in the average commercial shipment of wild oats."

As so doing may save labor, I shall consider first the charge of misbranding mentioned as (b) in the new stipulation. In the above-mentioned opinion I assumed that the dry seeds of wild oats cannot be classed as a food, within the meaning of the Food and Drugs Act. 34 Stats. 768 (Comp. St. §§ 8717–8728). I doubt if there is any better source of common knowledge than well-known reference books, such as are mentioned below:

In 19 Encyclopædia Britannica (11th Ed.) p. 938, it is said that the grain of the wild oat is "small and worthless."

In 17 New International Encyclopædia (1922) p. 327, it is said:

"There are a number of species of but little importance; such as wild oats (Avena fatua), which is generally considered as a weed, but has become an abundant and valuable wild pasture grass in California. * * *"

In 11 Ency. Americana, under the topic "Oats," it is said:

" * * * Wild oats (A. fatua), valued in some places, for example, California, for pasturage, but generally regarded as a noxious weed."

In 9 Nelson's Ency. p. 119, is the following:

"Wild oats (A. fatua) are usually classed as weeds, but are used as a pasture grass in certain localities, especially California."

In 8 Universal Cyclopedia (1905) p. 542, it is said:

"The cultivated oat (Avena sativa) is an annual. * * * It is supposed to have developed from Avena fatua, found growing wild in Europe, where it is considered a weed. It is also wild in California, where it is sometimes cut *when green* and cured for hay."

In Century Dictionary, "Oats," it is said:

"The wild oat of Europe (A. fatua) is a weed of cultivation in many places; in California, where it abounds, it is extensively utilized as hay."

[1] While the foregoing authorities show that in California volunteer crops of the wild oat plant, while green, are pastured or cut as hay, they also show that the dried wild oat seed cannot be considered as a food. And it may be added that the foregoing quotations further show that it is a matter of common knowledge that generally the wild oat plant is regarded as a weed, in the sense that it is highly undesirable vegetation. It is true that in the first stipulation there is mention of commercial shipments of wild oats. But it does not follow that the seed of the wild oat is ever shipped in commerce, except to grain dealers, for use as a food adulterant, or by grain dealers, after admixture with cultivated oats, as in the case at bar.

While I remain of opinion that it is common knowledge that the seed of the wild oat is not a food, still in discussing the clause of the Food Act now in question this fact is of no importance. If it be assumed that the wild oat seed is a food, yet the mixture here sought to be condemned may have been misbranded, because offered for sale under the distinctive name of another article.

[2] How the wild oats, weed seed, and chaff (which the claimants here mixed with the cultivated oats) were obtained by the claimants does not appear. Under the Regulations (Service and Regulatory Announcements, No. 46) authorized by the Grain Standards Act (39 Stat. 446, 482 [Comp. St. §§ 8747½–8747½k]) a consignment of cultivated oats containing more than 25 per cent. of wild oats or other foreign matter cannot legally be graded as oats at all. If such a consignment (having been sold for what it is) be received by a grain dealer, I see no reason why he may not legally winnow out enough of the wild oats and other weed seeds to bring the remainder of the consignment to a sufficient state of purity to be sold as oats of some legal grade, and in time great quantities of such winnowings may be accumulated by grain dealers.

Again, it could be, and I assume it is, a fact that in growing wheat in the West and Northwest a considerable area of some huge wheat field may be so thick with volunteer wild oats that it would be disastrous to the farmer to allow the gatherings from such part of the field to be mixed with the purer wheat from the remainder of the field. To avoid such mixing, the farmer may (and I assume does) keep the crop on the affected part of the field separate. It may be thrashed separately, and the grain (wild oats and a modicum of wheat)

thus obtained may be sold for what it is. But, however obtained by the grain dealer, the question here is as to the right to make a mixture of the winnowings, or of the wheat field offal, with cultivated oats, and to offer such mixture for sale under the name of sample grade oats.

As has been shown, the wild oat is a highly undesirable plant in much the greater part of the United States. Grain (containing wild oats and weed seed), although sold to be used as a food for domestic animals, may be used as seed for voluntary planting. Grain (containing wild oats and weed seed) fed to domestic animals may, and sometimes is, along with the manure, involuntarily planted, and there is thus a propagation of undesirable and harmful vegetation. The mixture of weed seed and wild oats with cultivated oats, as taken from the field, may conveniently and properly be spoken of as a natural mixture. It is natural in the sense that it may be practically unavoidable. A mixture made by purposely and voluntarily mingling winnowings from one lot of oats with another lot of oats, or by voluntarily mingling what I have spoken of as wheat field offal with cultivated oats, may properly be spoken of as an artificial mixture.

Planting a bushel of oats containing naturally 25 per cent. of impurities, and planting another bushel of oats containing artificially 25 per cent. of the same kind of impurities, may produce exactly the same evil results. But if the artificial and intentional addition of impurities to oats be permitted and practiced, the number of bushels of impure oats in existence will indubitably be unnecessarily increased; and in equal degree the probability of a propagation of undesirable vegetation will be increased. To unnecessarily increase the production of a weed or a pest, such as wild oats, is unwise and hurtful, and could have been within the intent of the statute; and when a dealer purposely makes such an artificial mixture, and offers it for sale as sample grade oats, he is using a name, properly applied to a natural product, as the designation of an artificial product.

As of course, the intent of the Food Act is the same now that it was when that statute was enacted. Whether or not offering for sale an artificial mixture of cultivated oats and wild oats as sample grade oats, after the Food Act and before the Grain Standards Act had been enacted, would have been a violation of the clause of the Food Act now in question may be doubtful; but I assume that it would not have been. However, paradoxical though it may be, so doing can be a violation of that clause now. It seems too plain to require discussion that there is nothing in the Grain Standards Act and nothing in the regulations thereunder which contemplate or authorize shipping a purposed artificial mixture of cultivated oats and wild oats as sample grade oats, or as oats of any grade. The unbelievable folly involved in authorizing a vast and wholly unnecessary increase in the diffusion of the seed of such a pest, as the wild oat is in much the greater part of the United States, is I think a sufficient reason for saving that the regulations refer to and contemplate only what I have called a natural mixture of wild oats and cultivated oats. It follows that the designation "sample grade oats" is authorized as applied to natural mixtures of certain proportions of wild and cultivated oats, and is not author-

ized as a designation of an artificial mixture of the same proportions of wild and cultivated oats. And offering for sale such artificial mixture under a name which is authorized as the designation only of a natural mixture violates the clause in question of the Food Act for two reasons:

(1) The use of the name "sample grade" will almost inevitably deceive some purchaser, either immediate or remote, as to the manner of production of the mixture. And I conceive that many persons, who would buy the naturally produced mixture, which is properly designated as sample grade oats, would refuse to knowingly buy an artificial mixture of the same proportions of wild and cultivated oats. Either a desire to discourage a vicious practice, or a public-spirited desire to avoid the danger of unnecessarily spreading an agricultural pest, or both, would I am satisfied prevent many persons from buying the artificial mixture, unless deceived into the belief that they were buying the practically unavoidable natural mixture. I am unable to concede that the case of Ninety-Five Barrels, etc., v. U. S. (C. C. A.) 289 Fed. 181, militates against the foregoing reasoning. The essence of that ruling is that the act of the manufacturer there in question did not mislead the public to its harm, or induce the purchase of a different article from that intended to be purchased. See 289 Fed. 186. The act of the claimants in the case at bar is certainly calculated to do both.

(2) Further, I am unable to hold that the only purpose of the particular clause of the Food Act now in question is to prevent deception:

"That for the purposes of this act an article shall also be deemed to be misbranded: In the case of food: First. If it be an imitation of or offered for sale under the distinctive name of another article. Second. If it be labeled or branded so as to deceive or mislead the purchaser. * * *"

The wording of this second paragraph does not comport with a theory that the sole and only intent of the first paragraph was to prevent deception of the purchaser. Hence, as the act done by the claimants, even if not deceptive is one that is impolitic and harmful to the public, and could have been intended to be forbidden, it seems sufficient to say, "thus is the law written." "Sample grade oats" is the distinctive name of a natural mixture of cultivated oats and certain impurities. Offering for sale (to the public detriment) a purposed artificial mixture of cultivated oats and the same impurities is, I think, offering an article for sale under the distinctive name of another article.

[3] The first stipulation shows that the mixture in question was shipped under the name of "sample grade star oats." It is seemingly contended that the addition of the word "star" to the designation of the mixture alters the result. But there is nothing in the record to indicate that that word conveyed to the purchaser knowledge that the mixure was an artificial one. The word has to the uninitiated no such significance, and, if it did have some agreed meaning to the purchaser, this fact was peculiarly within the knowledge of the claimants, and should have been proved by them. In the first stipulation is the following:

"The oats were inspected by a licensed government inspector at the point of shipment, and certified and graded by him as sample grade, and were sample grade."

[4] Counsel for both parties have written me that the last four words of the foregoing stipulation were not intended as an agreement that the designation "sample grade oats" was intended by the regulations to include an artificial and purposed mixture of cultivated and wild oats. However, the claimants do insist that the fact that an inspector, licensed by the government, certified the grain in question as sample grade oats, entitles them to a judgment in their favor. I cannot agree to this. It does not appear that the inspector knew that the grain was an artificial mixture. But in any event, I do not see why the principle that the government is not estopped by the defaults of its agents does not make discussion of this point unnecessary. See Utah Power, etc., Co. v. U. S., 243 U. S. 389, 408, 409, 37 Sup. Ct. 387, 61 L. Ed. 791.

From what has been said, it seems to me to follow that the claimants misbranded an article of food, consisting of an artificial mixture of a food (cultivated oats) and another food, or a food adulterant (wild oats seed), in that they offered for sale the said article under the distinctive name of another article, to wit, a natural mixture of cultivated and wild oats. It further follows that it is unnecessary to form an opinion in respect to the charge of adulteration by substitution.

An order, reciting the fact that by agreement the former order has not been executed, and condemning the oats under seizure, may be now taken.