[L. A. No. 6355. In Bank.—May 13, 1921]

JOHN A. JOSE, Jr., et al., Appellants, v. H. S. UTLEY, District Attorney, etc., Respondent.

[1] MINING LAW—LOCATION OF CLAIM—DISCOVERY OF MINERAL—PLEADING.—Allegations in a complaint that lands located as oil claims and described as "surveyed lands of the United States, known as mineral lands, and having the usual and very favorable geological and surface indications and evidence of containing valuable and extensive deposits of petroleum and mineral oils in commercial quantities," and that experienced oil experts were employed by plaintiffs to examine, test, and report upon the lands,

that from such examinations and testings a report was made in which it was stated "that the geological indications and evidence were unusually favorable for large and profitable deposits of mineral oil, and that apparently it would be developed into one of the best producing oil fields in the United States," fall short of alleging a discovery of oil within the meaning of the United States statutes authorizing the location of government mineral lands.

[2] ID.—LOCATION OF MINING CLAIMS—ABSENCE OF DISCOVERY OF MINERAL—POSSESSORY RIGHTS.—In the absence of discovery, the location of lands under the mining law merely authorizes the locator to maintain possession while diligently and in good faith prosecuting the work of endeavoring to discover minerals thereon.

[3] CORPORATIONS—WATERED STOCK—LIABILITY OF HOLDER OF STOCK TO CORPORATION.—If the purchaser of stock of a corporation is aware of the initial transaction by which the stock is issued for a consideration greatly less than par, he is liable to the corporation for the difference between the value of the property conveyed to the corporation for the stock and the amount of stock issued therefor *pro rata;* if he is not, those to whom the stock was originally issued for the inadequate consideration are liable.

[4] ID.—FRAUDULENT ISSUE OF STOCK—INADEQUATE CONSIDERATION.— Where it is proposed to issue stock of a corporation to purchasers for a consideration of only ten cents per share, the par value being one dollar per share, it is manifest that the transaction is fraudulent against creditors and stockholders.

[5] ID.—VIOLATION OF CORPORATE SECURITIES LAW—INJUNCTION— EQUITY.—Where the original issue of stock of a corporation is fraudulent by reason of a gross inadequacy of consideration transferred to the corporation for it, equity will not aid the parties by injunction to prevent prosecution for violation of the Corporate Securities Act, even if it be conceded that the law is unconstitutional and that the threatened action of the district attorney is erroneous.

APPEAL from a judgment of the Superior Court of San Diego County. T. L. Lewis, Judge. Affirmed.

The facts are stated in the opinion of the court.

R. M. Widney for Appellants.

U. S. Webb, Attorney-General, Leon French, Deputy Attorney-General, H. S. Utley, District Attorney, E. S.

2. Sufficiency of discovery of minerals to support location of mining claim, note, 15 Ann. Cas. 628.

Lovett, Assistant District Attorney, and H. L. Carnahan for Respondent.

WILBUR, J.—This action was brought by the plaintiffs to enjoin the defendant from prosecuting Margaret Truax for violating the corporate securities law (Stats. 1917, p. 673; Stats. 1919, p. 231), popularly known as the "Blue Sky Law." Margaret Truax is engaged in selling one million shares of corporate stock in the Imperial Pacific Oil, Gas and Refining Company, a corporation. Plaintiffs claim that the Corporate Securities Act is unconstitutional for various reasons and that the threatened action of the district attorney should be restrained. A demurrer was interposed to the complaint, was sustained, and judgment thereupon rendered in favor of the defendant, from which the plaintiffs appeal.

In order to understand appellants' contention, it will be necessary to state some of the facts alleged in the complaint. Plaintiffs located placer oil mining claims upon fifty-six quarter-sections of surveyed government land in the Imperial Valley, by posting and recording notices of location describing the property by quarter-sections in each location notice. In addition to these locations it is alleged that some 250 associates of the plaintiffs have located additional land amounting, together with the fifty-six sections, to a total of 35,520 acres. Plaintiffs organized the Imperial Pacific Oil, Gas and Refining Company under the laws of the state of Arizona for the purpose of conveying to such corporation the locations upon the fifty-six quarter-sections (8,960 acres) of land out of the 35,520 acres, in consideration of two million four hundred and ninety-six thousand shares of the capital stock, fully paid up and nonassessable, of the capital of two million five hundred thousand dollars, divided into two million five hundred thousand shares of stock of the par value of one dollar per share. In pursuance of plaintiff's plan, articles of incorporation were prepared and filed in the office of the Arizona corporate commission, February 12, 1919, wherein I. J. Lipsohn, F. S. Hess, and H. A. Waltz were named as directors, and also as president, vice-president, and secretary and treasurer, respectively. The meeting of this board of directors, as appears by the minutes thereof, which are attached to the complaint as an exhibit, was held March

6, 1919, wherein it was announced that the secretary had received four dollars for four shares—one dollar from I. J. Lipsohn, one dollar from F. S. Hess, and two dollars from M. A. Waltz—in pursuance whereof four shares of stock were issued; one to I. J. Lipsohn, one to F. S. Hess, and two to M. A. Waltz. Thereupon the directors considered a proposal dated Los Angeles, California, February 10, 1919 (two days before the filing of the articles of incorporation), addressed to the board of directors of the corporation offering to sell to the corporation ''for and in consideration of two million four hundred and ninety-six thousand dollars, consisting of two million four hundred and ninety-six thousand shares of the par value of one dollar per share, the same to be issued fully paid up and nonassessable, and to be issued to such person or persons, in such number of shares at such time or times as we shall or may from time to time in writing demand, all our rights, claims and interests in the following described property.''

This proposal contains a description of oil claims upon only sixteen quarter-sections of land amounting to *2,560 acres,* instead of 8,960 acres as planned. Thereupon the board of directors accepted the proposition in a resolution reciting that ''the property mentioned therein *being worth in the judgment of the directors, the sum of two million four hundred and ninety-six thousand dollars* in the capital stock of this corporation.'' The officers of the corporation were directed to complete the purchase from plaintiff of the four sections by the payment to plaintiffs or on their order of the sum of two million four hundred and ninety-six thousand dollars in the capital stock of the corporation, which ''said shares upon being issued and delivered shall thereby become and be fully paid and nonassessable, as provided by the articles of incorporation.''

Immediately after the passage of this resolution accepting plaintiffs' offer, F. S. Hess resigned as director and vice-president, and two of the plaintiffs, Walter C. Wibeck and Harry L. Hollingworth, were elected; one to fill the vacancy caused by the resignation of Hess, and the other to fill the vacancy due to the fact that the by-laws provided for four directors, three only being named in the articles of incorporation. On March 8th, two of the plaintiffs, Walter C. Wibeck and Harry L. Hollingworth, met as directors of the

corporation, accepted the resignation of I. J. Lipsohn and M. A. Waltz as directors, and elected two other of the plaintiffs, John A. Jose and James Howze, as directors of the corporation. The plaintiffs were thus in full control of the corporation, the dummy directors having resigned. The agreement to accept the location upon four sections of land in exchange for two million four hundred and ninety-six thousand shares of fully paid stock had not been consummated by the conveyance of the land or the issuance of the stock. On April 1, 1919, the directors, being four of the plaintiffs, consented in writing to the holding of a meeting of the board of directors of the corporation, and passed a resolution to make application to the Arizona corporation commission for permission to issue to the plaintiffs, or such persons as they might direct, one million nine hundred and ninety-six thousand shares, fully paid up and nonassessable. An additional proposal was submitted by the plaintiffs for one transfer to the corporation of their interests in eight sections of land (5,120 acres) for the sum of eight dollars. The resolution accepting this proposal recited that the interests of plaintiff therein was worth in excess of eight dollars.

In the complaint the parties in interest, the plaintiffs and their associates, are referred to as of "limited financial ability." It is alleged that the formation of this corporation under the laws of Arizona was brought about "as being more liberal and less expensive and better suited to the limited financial ability of the parties in interest." And further, "that these plaintiffs, and said service men, being unable, from their limited private resources to provide the proper funds for development and expenses, and for the purpose of raising such funds with the least expense and delay from technical legal entanglements and obstructions, decided to pool one million (1,000,000) shares of their private stock, and to legally sell the same or so much thereof as was necessary, and on safe and reasonable terms to purchasers, so as to give the purchasers a fair chance in the benefits of a successful future development and rise in stock value.

"That from the proceeds of said sales there would be paid the necessary current expenses thereof, and that the balance would be spent in the development for oil on said eighty-nine hundred sixty (8,960) acres, for the benefit of all parties in interest."

It is alleged that said one million shares of stock were to be transferred to a competent business trustee, experienced in methods of selling and having offices and appliances therefor, ''and thereby avoid the necessity of incurring all these expenses for office rent, furniture, books, stationery, typewriters, clerks and employees.'' In pursuance of this purpose, on July 10, 1919, plaintiffs entered into a written agreement with Margaret Truax, whereby they transferred to her one million shares of stock in the corporation to create a fund for drilling purposes. This stock she was to sell at a price not less than ten cents per share, receiving and holding the proceeds derived from such sale or sales up to ten cents (10 cents) as a trust fund to be used for drilling and development purposes on the land of the Imperial Pacific Oil, Gas and Refining Company. She was to have as compensation for acting as trustee all such sum or sums of money as she might secure from the sale of said stock over and above ten cents, to be full compensation for her services. The funds so derived for the corporation (which could not exceed one hundred thousand dollars) were to be paid out by her for the said drilling operations, which were to be conducted under the direction and supervision of the corporation, through its duly authorized officers.

It is further agreed that the trustee should not be responsible for the failure or mistakes in drilling of wells or developing the property.

Thereafter, Margaret Truax sought to secure a broker's permit in accordance with the Corporate Securities Act, and before the issuance of said permit, proceeded to advertise said stock for sale. Purchasers were required to sign the following:

"Imperial Pacific Oil, Gas and Refining Company.

"Application for Development Fund Stock

"NOTICE—Right is reserved to withdraw all offerings at any time without notice, or to reject any application, or to allot a less number of shares than applied for.

"TO: M. TRUAX, TRUSTEE OF 'DEVELOPMENT FUND,' IMPERIAL PACIFIC OIL, GAS AND REFINING COMPANY.

"I herewith subscribe for and agree to take —— shares of the stock being sold by you in trust for the benefit of the

Development Fund of the Imperial Pacific Oil, Gas and Refining Company, and agree to pay therefor the sum of —— Dollars.

"In making this application, I understand that the business of prospecting for oil is hazardous and that no guarantee is made me that oil will be discovered. With this understanding, I consequently relieve you from all claims for liability in the event oil is not discovered, and the money herein subscribed for development purposes lost. Said money is hereby contributed to said development fund as per your trust terms.

"Name ————————————.
"Address    ————————————.''

It is further alleged that the corporation commissioner refused to permit sales of said stock or advertisements therefor until the corporation should receive a permit for the original issue and sale of the stock by the corporation, claiming that said original issue was void under the Corporate Securities Act of California.

Plaintiffs allege that notwithstanding the alleged unconstitutionality of the Corporate Securities Act they endeavored to comply with the demands of the commissioner and made application to such commissioner, which application is set up in the complaint. Plaintiffs, owing to the expense of complying with the orders of the commissioner of corporations, as they allege, finally decided to ignore the orders of the commissioner and, on July 28, 1919, thereupon, it is alleged, the commissioner directed the defendant, district attorney of San Diego County, to proceed to prosecute Margaret Truax and the San Diego newspapers for "publishing the advertisements relating to said oil lands, or territory thereabout, or relating to historical or geological reports on other successful oil fields and profitable investments therein, all of which were truly and fairly stated in said advertisements; said order or decision stating substantially that the newspapers were to be treated leniently, and that said M. Truax was the party they were after."

Plaintiffs allege that by reason of the invalidity of the Corporate Securities Act, no criminal cause of action exists against plaintiffs or M. Truax, or the San Diego newspapers. It is further alleged that prosecutions under this act would cause a multiplicity of prosecutions and litigation.

[1]  It is nowhere alleged in the complaint that there has been any discovery of oil upon any of the property located by the plaintiffs or their associates.  On this subject it is alleged the lands located as oil claims and described in the complaint "were surveyed lands of the United States, known as mineral lands, and having the usual and very favorable geological and surface indications and evidence of containing valuable and extensive deposits of petroleum and mineral oils in commercial quantities.

"That said lands were unappropriated and were open to location and development under the laws of the United States by these plaintiffs, and other persons qualified under such laws."

It is further alleged that experienced oil experts were employed by the plaintiffs to examine, test, and report upon the lands; that from such examinations and testings a report was made in which it was stated "that the geological indications and evidence were unusually favorable for large and profitable deposits of mineral oil, and that apparently it would be developed into one of the best producing oil fields in the United States."

These allegations fall short of alleging a discovery of oil within the meaning of the United States statutes authorizing the location of government mineral lands (U. S. Rev. Stats., secs. 2324–2329, [6 Fed. Stats. Ann., 2d ed., pp. 532–575; U. S. Comp. Stats., sec. 4620, etc.]; *Miller* v. *Chrisman,* 140 Cal. 440, [98 Am. St. Rep. 63, 73 Pac. 1083, 74 Pac. 444]; *Nevada Sierra Oil Co* v. *Home Oil Co.,* 98 Fed. 673–675).

[2]  In the absence of discovery, the location of these lands merely authorized the locator to maintain possession while diligently and in good faith prosecuting the work of endeavoring to discover minerals thereon.  The rule is thus stated in *Union Oil Co.* v. *Smith,* 249 U. S. 337, [63 L. Ed. 635, 39 Sup. Ct. Rep. 308]: "In the California courts the right of a locator before discovery, while in possession of his claim and prosecuting exploration work, is recognized as a substantial interest, extending not only as far as the *pedis possessio,* but to the limits of the claim as located; so that if a duly qualified person peaceably and in good faith enters upon vacant lands of the United States prior to discovery but for the purpose of discovering oil or other valuable mineral deposits, there being no valid mineral location upon it,

such person has the right to maintain possession as against
violent, fraudulent, and surreptitious intrusions so long as he
continues to occupy the land to the exclusion of others, and
diligently and in good faith prosecutes the work of en-
deavoring to discover mineral thereon. (*Miller* v. *Chris-
man*, 140 Cal. 440, 447, [98 Am. St. Rep. 63, 73 Pac. 1083,
74 Pac. 444; case affirmed in 197 U. S. 313, [49 L. Ed.
770, 25 Sup. Ct. Rep. 468, see, also, Rose's U. S. Notes];
*Weed* v. *Snook*, 144 Cal. 439, [77 Pac. 1023]; *Merced*
*Oil Min. Co.* v. *Patterson*, 153 Cal. 624, 625, [96 Pac.
90]; 162 Cal. 358, 361, [122 Pac. 950]; *McLemore* v.
*Express Oil Co.*, 158 Cal. 559, 562, [139 Am. St. Rep.
147, 112 Pac. 59].) The expense of drilling one oil well
is from one hundred thousand dollars to one hundred and
fifty thousand dollars. Under the system of financing
adopted by the promoters of the corporation, it would
receive money enough to only sink one well to such a
depth as one hundred thousand dollars might justify. In
order to hold the balance of the land located, it would be
essential to put down an oil well on each 160 acres of land
(*Union Oil Co.* v. *Smith, supra*) which would cost five
million six hundred thousand dollars, at the estimated cost
of one hundred thousand dollars per well. It is thus ap-
parent that under the scheme adopted for financing this
corporation only one well could be sunk which, if successful,
would give the corporation title to 160 acres of land. It is
also apparent from the foregoing that none of the parties
interested in this organization believed that the property
transferred to the corporation was worth two million four
hundred and ninety-six thousand dollars, and that the offer-
ing of the corporate stock at ten cents per share, with a
commission of all over that amount, was an indication of
their belief that the stock was not worth more than ten cents
per share.

It is proposed to issue stock to purchasers who pay there-
for only ten cents, as fully paid up. **[3]** Under our deci-
sions, if the purchaser is aware of the initial transaction, he
would be liable to the corporation for the difference between
the value of the property conveyed to the corporation for
the stock and the amount of stock issued therefor, *pro
rata;* if he was not, plaintiffs would be liable therefor.
(*Sherman* v. *S. K. D. Oil Co., ante,* p. 534, [197 Pac. 799].)

It is apparent from the complaint that plaintiffs would be utterly unable to respond to this great liability.

The respondent contends that the method of sale adopted, if stock is offered at fifteen cents per share, was a representation to the public that the property of the corporation was worth at least three hundred and seventy-five thousand dollars, that is, two and one-half million times fifteen cents, and that it was in fact valueless. [4] It is sufficient for us to say that it is manifest from the complaint that the issuance of the capital stock of the corporation was fraudulent as against creditors and stockholders, because of the excessive valuation placed upon the property acquired by the corporation, which brings the transaction under the rule announced first in *Vermont Marble Co.* v. *Declez Granite Co.,* 135 Cal. 579, [87 Am. St. Rep. 143, 56 L. R. A. 728, 67 Pac. 1057], and adhered to through a long line of cases, the last of which is *Sherman* v. *S. K. D. Oil Co., supra,* holding such a transfer of corporate stock to be fraudulent as to future creditors, and that the representation upon the face of the stock was a false statement of the fact, calculated to deceive both future creditors and stockholders.

[5] In view of the fraudulent nature of the transaction sought to be carried out, equity will not aid the plaintiffs by an injunction even if it be conceded that the law attacked is unconstitutional and the threatened action of the district attorney is, therefore, erroneous. It is sufficient on this point to cite a decision of the United States district court, in *National Mercantile Co.* v. *Keating,* 218 Fed. 477, wherein the constitutionality of the blue sky law of Montana was attacked by a plaintiff who sought to enjoin the enforcement of the law, but as the plaintiff came into court with unclean hands, that court refused relief.

Judgment affirmed.

Angellotti, C. J., Lennon, J., Olney, J., Shaw, J., Sloane, J., and Lawlor, J., concurred.