[Civ. No. 2814. Third Appellate District.—June 19, 1925.]

A. R. GREGORY, Respondent, v. G. H. HECKE, as Director of the Department of Agriculture, etc., Appellant.

[1] ECONOMIC POISON ACT—MISREPRESENTATION OF PRODUCTS—LEGISLATIVE INTENT.—While the term "misrepresent" is not used in section 2 of the California Economic Poison Act of 1921, the term "misbrand" which is used in the title of the act includes that of misrepresentation; and the evident intent of the legislature was to prohibit the adulteration, misbranding and misrepresentation in the use or sale of economic poisons.

[2] ID.—STATUTORY CONSTRUCTION.—In construing the California Economic Poison Act of 1921, the court will take into consideration the clear import of the language used, together with the mischief sought to be avoided and the remedy intended to be afforded by the statute.

[3] ID.—REGULATION OF POISONS—PROTECTION OF INTERESTS OF STATE—INTENT.—The legislature intended by the California Economic Poison Act of 1921 to not only regulate the manufacture and sale of economic poisons, but it intended also to protect the large and valuable orchard and horticultural interests of the state against fraud, imposition and misrepresentation as to the efficiency of antidotes for germ and fungoid diseases.

[4] ID.—EXISTENCE OF GERMS AND PESTS—EFFICACY OF SPRAYS AND GERMICIDES—JUDICIAL NOTICE.—The court will take judicial notice of the fact that innumerable germs and pests infest the orchards, the vineyards and the gardens of our state, and that certain sprays and germicides are most effective in eradicating these pests, and thus increasing the productiveness of the trees and vines to the profit of the farmer and the welfare of the public.

[5] ID.—EVILS DEMANDING LEGISLATION—MISCHIEF TO BE REMEDIED.—Judicial notice will be taken of the evils demanding legislation, the mischief intended to be remedied, and the importance of public interests affected thereby.

[6] ID.—POLICE POWERS—REASONABLE LEGISLATION—PROHIBITION OF FRAUD AND DECEIT.—While legislation under the police powers must not be unreasonable, or oppressive, all property within the jurisdiction of the state is held subject to reasonable regulations so that it may not be used to the detriment of the equal rights of others; and it is a valid regulation of business under the police powers to prohibit fraud, deceit and imposition.

[7] ID.—BRANDING OF PACKAGES—REASONABLE REGULATION—MISSTATEMENTS AS TO CONTENTS.—While statutes attempting to regulate the branding and labeling of packages must be reasonable and not impose onerous or unnecessary burdens upon private business under the guise of an exercise of police powers, yet misstatements and misrepresentation as to the contents, ingredients, weight, etc., in the labeling of the product constitutes a misbranding and a violation of the police regulations.

[8] ID.—MISLABELING OF GERMICIDE—VIOLATION OF ACT.—To permit one to advertise, label and sell germicide as "The most efficacious

2.   See 23 Cal. Jur. 763; 25 R. C. L. 1015.
5.   See 23 Cal. Jur. 764.
6.   See 5 Cal. Jur. 688; 6 R. C. L. 193.

remedy known; an absolute remedy for; and the greatest remedy known for mildew, fungus, curl-leaf, thrips, aphis, codlin-moth, eggs and larvae of pests and insects," etc., when in truth such compound is not efficacious for any of such purposes, and is of little or no use for such purposes, would be a direct violation of the letter and spirit of the Economic Poison Act of California, and it would be encouraging fraud and imposition upon the public.

[9] ID.—CONSTITUTIONAL LAW—EQUITY—FRAUD.—Even though an act may be unconstitutional, equity will not intervene to sanction a fraud or gross imposition upon the public.

[10] ID.—CONSTITUTIONAL LAW—STATUTORY CONSTRUCTION.—A court should not declare a statute unconstitutional unless it is clearly and palpably so and is incapable of reconciliation.

[11] ID.—UNIFORM OPERATION OF LAWS.—The provision of article I, section 11, of the constitution that "All laws of a general nature should have a uniform operation," does not mean that the law shall operate alike upon all persons, but that it shall affect all persons uniformly who stand in the same category or upon those who stand in the same relation with respect to the particular privileges and immunities conferred by the act.

[12] ID.—SPECIAL LEGISLATION.—The California Economic Poison Act of 1921 purports to operate uniformly upon all persons who "manufacture, sell or use economic poisons," and is not special legislation.

[13] ID.—CLASSIFICATION OF LEGISLATIVE REGULATION.—In determining the legality of classification for legislative regulation there should be considered the general subject to be regulated, its character, extent and purpose, together with those who would be naturally affected thereby; but there are good and natural reasons for regulating the business of handling and selling economic poisons, and this classification is natural and valid.

[14] ID.—DUTIES OF DIRECTOR OF AGRICULTURE—LICENSING POWERS—CONSTITUTIONAL LAW—CERTIORARI.—Conferring upon the Director of Agriculture the duty to regulate the manufacture, sale and use of economic poisons, together with the means of enforcing this act by licensing, or revoking the licenses of dealers, does not violate the provisions of article III of the constitution, nor article VI, section 1, of that document; and the power so conferred upon the Director of Agriculture is not arbitrary or final, as he can act only pursuant to law, after notice, in a *quasi*-ju-

10. See 5 Cal. Jur. 615.
13. See 5 Cal. Jur. 823.

dicial capacity only, and· his decisions are subject to review on *certiorari.*

[15] ID.—REVOCATION OF LICENSES—DUE PROCESS.—The power conferred by the California Economic Poison Act of 1921 to revoke a license for violation of the provisions of said act, does not infringe upon the inhibition of article I, section 14, of the state constitution, or the fourteenth amendment of the constitution of the United States, prohibiting the taking of private property without due process of law.

[16] ID.—DUE PROCESS—ORDERLY PROCEEDING—HEARING.—Due process of law does not necessarily mean that a person is entitled to a trial in a court before he may be deprived of what may be equivalent to property rights, but it does mean that an orderly proceeding adapted to the nature of the case shall be accorded to the owner of the property, in which he may be heard, and where he may defend, enforce and protect his personal rights.

[17] ID.—RIGHT TO ENGAGE IN ·BUSINESS—INHERENT POWER OF STATE TO REGULATE.—The general right to engage in a trade, profession or business is subject to the power inherent in the state to make necessary rules and regulations respecting the use and enjoyment of property necessary for the preservation of the public health, morals, comfort, order and safety; and such regulations do not deprive owners of property without due process of law.

[18] ID.—ISSUANCE OF LICENSE—VESTED RIGHT TO CONTINUE.—No person can acquire a vested right to continue, when once licensed, in a business, trade or occupation which is subject to legislative control under the police powers.

[19] ID.—JURY TRIAL—CONSTITUTIONAL LAW.—The California Economic Poison Act is not in violation of article I, section 7, of the state constitution guaranteeing a trial by jury, as the trial by jury is assured in only such cases as existed at common law, and a jury trial may not be demanded in special proceedings unless the right is given by statute.

[20] ID.—REVOCATION OF LICENSES—CONSTITUTIONAL LEGISLATION.—Statutes are not unconstitutional which provide for the revocation of licenses and permits.

[21] ID.—ACCEPTANCE OF BENEFITS—ESTOPPEL TO ATTACK VALIDITY. A manufacturer is estopped from denying the validity of the California Economic Poison Act of 1921, where for several years he has registered his product, and has been licensed to manufac-

ture and sell the same, and he is licensed for the current year and enjoying the protection of said statute at the time he challenges its constitutionality.

(1) 2 C. J., p. 1006, n. 96 New.    (2) 36 Cyc., p. 1107, n. 31, 32, p. 1110, n. 56, 57.    (3) 2 C. J., p. 1006, n. 96 New.    (4) 23 C. J., p. 64, n. 3 New, p. 157, n. 92, 92 New.    (5) 12 C. J., p. 913, n. 64, p. 918, n. 28, p. 920, n. 56; 23 C. J., p. 122, n. 95.    (6) 2 C. J., p. 988, n. 9; 12 C. J., p. 920, n. 44, p. 923, n. 69, 71, p. 934, n. 44, 47.    (7) 12 C. J., p. 927, n. 98 New.    (8) 2 C. J., p. 1106, n. 96 New.    (9) 21 C. J., p. 112, n. 36.    (10) 12 C. J., p. 797, n. 35 New, 37.    (11) 36 Cyc., p. 992, n. 90, 91.    (12) 2 C. J., p. 1006, n. 96 New; 36 Cyc., p. 992, n. 91.    (13) 36 Cyc., p. 992, n. 90.    (14) 2 C. J., p. 1006, n. 96 New; 12 C. J., p. 903, n. 34.    (15) 2 C. J., p. 1006, n. 96 New.    (16) 12 C. J., p. 1192, n. 71, p. 1193, n. 73.    (17) 12 C. J., p. 1272, n. 23.    (18) 12 C. J., p. 959, n. 97 New.    (19) 35 C. J., p. 148, n. 8, 9, p. 178, n. 63.    (20) 2 C. J., p. 1006, n. 96 New; 35 C. J., p. 185, n. 64.    (21) 12 C. J., p. 769, n. 32, 33, 34.

APPEAL from a judgment of the Superior Court of Sacramento County. Malcolm C. Glenn, Judge. Reversed.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, J. Charles Jones, Thomas H. Christiansen and R. T. McKisick, Deputies Attorney-General, for Appellant.

B. M. Aikins for Respondent.

THOMPSON, J., *pro tem.*—This is an appeal from a judgment by default entered against defendant for failure to answer the petition for a writ of prohibition, after a general demurrer thereto had been overruled.

The writ prohibits appellant from proceeding pursuant to the provisions of the California Economic Poison Act of 1921 (Stats. 1921, p. 1259), to hear or revoke respondent's license to manufacture and sell a compound known as "Qua-Sul," a germicide intended for the purpose of eradicating mildew, aphis, codlin-moth, germs and fungoid diseases of plants and trees.

The petition alleges that for a number of years the petitioner has been engaged in the manufacture and sale of this "Qua-Sul"; that it is intended for use as a germicide

for treatment of diseases of trees and plants, and for the destroying of the larvae of various pests; that he has established a large demand and market for this germicide of the value of several thousand dollars; that for several years he had been licensed to conduct this business, and on June 4, 1923, he had paid appellant the required license fee of fifty dollars for registration for the ensuing year; that subsequently, on August 13, 1923, appellant instituted proceedings against petitioner to cancel his said license on the ground that the germicide was of little or no value for the purposes for which it was intended to be used; that pursuant to said proceedings appellant had procured a citation to be served upon petitioner requiring him to show cause at a time and place fixed why his said license should not be revoked for the reasons stated in the citation. It was alleged that the proceedings and threatened revocation of license would cause petitioner great and irreparable damage, and that there was no speedy or adequate remedy at law. The petition then prays for an order restraining appellant from proceeding with said hearing, or revoking his license.

The citation or order to show cause is made a part of the petition. It demands of the petitioner that he appear at the office of the Director of Agriculture in Sacramento on August 27, 1923, and show cause why his license to manufacture and sell the economic poison called "Qua-Sul" should not be canceled under the authority conferred by section 14 of the California Economic Poison Act of 1921 on the ground that it was of little or no value for the purpose for which it was intended to be used.

The citation then proceeded in detail to state the result of expert investigation as to the properties and efficiency of said germicide. It further set out petitioner's advertised claim of efficiency in his printed pamphlets and upon his labeled packages, as follows: "Qua-Sul, the most efficacious remedy known for mildew, rust, smut, fungus, black-spot, wilt, curl-leaf, red-spider, thrip, aphis, codlin-moth. Qua-Sul is a germicide and fungicide. It is an absolute remedy for mildew, and fungoid diseases, and is the greatest germicide in the world. It will kill the eggs of different pests that deposit their eggs or larvae in the ground. If sprayed on the trees and fences in a weaker solution of 1 to 200 it

73 Cal. App.—18

has the same effect there. It is the greatest germicide known, and kills all insect eggs in the soil.''

The citation attached to the petition then specifically denies that said compound will "as alleged in the printed circular and labels attached to the containers" effectively control millipedes, wireworms, angleworms, slugs, argentine ants, mildew, rust, smut, fungus, black-spot, wilt, curl-leaf, red-spider, thrips, aphis or codlin-moth. And denies that the solution when applied to the soil as advertised will destroy insects or eggs, larvae or pests at a greater depth than one-eighth of an inch from the surface.

To this petition the Director of Agriculture demurred on the ground that it failed to state a cause of action for the remedy of prohibition. The demurrer was overruled. The defendant saw fit to rest upon the record and failed to answer. Whereupon judgment was entered against him. From this judgment he appeals.

The petitioner supports his writ of prohibition on the ground that there is no authority of law to withhold or cancel a license to manufacture or sell a commodity upon the mere ground that it is of little or no value for the purpose for which it is intended to be used; that he is not charged by the citation with adulteration, misbranding or misrepresentation of the economic poison in question; and that the California Economic Act of 1921 is unconstitutional and void, because it purports to confer illegal judicial powers upon the Director of Agriculture, an executive officer; because it is special legislation; because it denies the right of trial by jury; and because it deprives one of property without due process of law contrary to section 1 of the fourteenth amendment to the constitution of the United States. Other claims of the unconstitutionality of the act in question are made in the petition, but not urged in the briefs, or upon oral argument.

The appellant insists that the California Economic Poison Act of 1921 is a valid statute under the police powers inherent in the state legislatures; that the police powers not only authorize the regulation of business in the interest of public health, public peace and public morals, but in the interest of public welfare, may legislate to prevent fraud, misrepresentation and imposition.

Under the provisions of this Economic Poison Act, any manufacturer, agent or dealer in any economic poison must file with the Director of the Agricultural Department of California an application for registration of such poison, together with a correct statement of the brands, trademarks and kinds of economic poisons to be marketed, specifying the correct names and percentages of all active and inert substances contained in the poison, or in lieu thereof must furnish a sample of the compound; he must procure a certificate of registration and license from the director of the agricultural department, and pay the annual fee therefor. He may then manufacture and sell such economic poison only in conformity with the provisions of said act, and such reasonable regulations as the department may enforce.

The title to this act is "An act to regulate the manufacture, sale and use of economic poisons; to prevent the adulteration, misbranding, and misrepresentation of economic poisons," etc.

The term "economic poison" as used in this act is defined as including "any substance, or mixture of substance intended to be used for preventing, destroying, repelling, or mitigating any and all insects, fungi, weeds, rodents, or other plant or animal pest, which may infest or be detrimental to vegetation. . . . "

It is provided that economic poisons shall be deemed to be misbranded "if the package or label shall bear any statement, design or device regarding such article or the ingredients or substance contained therein which shall be false or misleading; . . . if it be labeled or branded so as to deceive or mislead the purchaser; . . . if it consists partly or completely of an inert substance, which does not prevent, destroy, repel or mitigate insects, fungi, weeds, rodent or other plant or animal pests, and does not have the names and percentage amounts of each and every one of such inert ingredients plainly and correctly stated on the label . . . "

This act makes it unlawful for any person to "manufacture, deliver, or offer to deliver, sell, offer or expose for sale in this state any adulterated or misbranded economic poison."

The Director of Agriculture is authorized and directed by this act to regulate the manufacture and sale of all such

economic poisons within the state of California; and to license or revoke licenses for such purposes. To this end rules and regulations may be adopted and the procedure for hearing applications for registration, or revocation of licenses is also provided for.

Section 14 of this act provides that "The director of agriculture shall have the power after hearing, as provided for in this act to cancel or refuse to register any economic poison which has been shown to have *little or no value for the purposes for which it is intended to be used,* or has been shown to be generally detrimental or seriously injurious to vegetation. . . . Said director shall have the power to cancel the registration of, or refuse to register, any manufacturer, importer, agent of, or dealer in economic poisons who repeatedly violates any of the provisions of this act."

It is apparent from the petition that, after scientific investigation, the Director of Agriculture was charging petitioner with violation of the Economic Poison Act in (1) manufacturing and selling an economic poison which was of little or no value for the purpose for which it is intended to be used, and (2) misbranding and misrepresenting the compound.

The citation served upon petitioner does not specifically charge him with "misbranding or misrepresenting" the germicide. But it does state facts which, if true, would constitute both misbranding and misrepresenting under the definition of misbranding above quoted and found in section 7 of the act. For it is alleged that the labels and the circulars distributed by petitioner to his customers represented that "Qua-Sul was the most efficacious remedy known; and an absolute remedy for; and the greatest germicide known to destroy mildew . . . aphis, codlin-moth . . . fungoid disease . . . eggs and larvae of insects and pests," etc. These extravagant assertions are specifically denied by the Director. And he adds that the germicide is of little or no use for the purpose for which it is intended to be used.

[1] The term "misrepresent" is not used in section 2 of the act, which prohibits one from manufacturing or selling adulterated or misbranded economic poison. The term "misbrand" certainly includes that of misrepresentation. The latter term is used in the title to the act. The evident intent of the legislature was to prohibit the adulteration,

misbranding and misrepresentation in the use or sale of economic poisons. [2] In construing the act, the court will take into consideration the clear import of the language used, together with the mischief sought to be avoided, and the remedy intended to be afforded by the statute. (25 R. C. L. 1015.)

[3] Clearly the legislature intended by this act to not only regulate the manufacture and sale of economic poison, but it intended also to protect the large and valuable orchard and horticultural interests of California against fraud, imposition and misrepresentation as to the efficiency of antidotes for germ and fungoid diseases.

[4] The court will take judicial notice of the fact that innumerable germs and pests infest the orchards, the vineyards and the gardens of our state, and that certain sprays and germicides are most effective in eradicating these pests, and thus increasing the productiveness of the trees and vines to the profit of the farmer and the welfare of the public. [5] Judicial notice will be taken of the evils demanding legislation, the mischief intended to be remedied, and the importance of public interests affected thereby. (*Ex parte Kohler,* 74 Cal. 38 [15 Pac. 436].)

It is not disputed that the public health, public morals, and general public welfare, may be preserved under the police powers vested in the state. (5 Cal. Jur. 696.) [6] While it is true that legislation under the police powers must not be unreasonable, or oppressive, yet all property within the jurisdiction of the state is held subject to reasonable regulations so that it may not be used to the detriment of the equal rights of others. (6 R. C. L. 193.) And so it has been held to be a valid regulation of business under the police powers to prohibit fraud, deceit and imposition. (12 C. J. 920; 6 R. C. L. 208.) In *Cofman* v. *Ousterhous, State Dairy Com.,* 40 N. D. 390 [18 A. L. R. 219, 168 N. W. 826], upholding the constitutionality of an act regulating dairy interests, and licensing and authorizing the withholding of licenses under specified conditions, the court said: "The police power of the state is not limited to the mere regulation of affairs to preserve the good order, public health and safety. The prevention of fraud and deceit, cheating and imposition, is equally within the power, and a state may prescribe all such

regulations as in its judgment will secure, or tend to secure the people against the consequences of fraud.''

In the interest of public health, public morals, and public welfare, statutes have been upheld in nearly every state of the Union regulating and licensing various businesses and professions, governing marketing associations of farm products; controlling the manufacture and sale of drugs, meat, milk, butter, cheese, cereals, medicines, beverages, sprays, fertilizer, germicide, and food products of nearly every variety consumed by beast and man. So, also, has the delegation of power to commissions and officers been held to be valid, authorizing them to regulate the business of handling and selling such commodities, specifying the weight, size, contents and labeling of containers.

[7] While it is true that statutes attempting to regulate the branding and labeling of packages must be reasonable and not impose onerous or unnecessary burdens upon private business under the guise of an exercise of the police powers (*Ex parte Dietrich,* 149 Cal. 104 [5 L. R. A. (N. S.) 873, 84 Pac. 770]), yet numerous cases have held that misstatements and misrepresentation as to the contents, ingredients, weight, etc., in the labeling of the product constitutes a misbranding and a violation of the police regulations. (11 R. C. L. 1106; *United States* v. *Ten Barrels of Vinegar,* 186 Fed. 399; *People* v. *Butler,* 134 App. Div. 151 [118 N. Y. Supp. 849]; *State* v. *Intoxicating Liquors,* 106 Me. 135 [76 Atl. 268]; *United States* v. *Scranton,* 180 Fed. 485; *United States* v. *100 Cases of Apples,* 179 Fed. 985; *Brina* v. *United States,* 179 Fed. 373 [105 C. C. A. 558]; *United States* v. *154 Sacks of Oats,* 294 Fed. 340.)

[8] To permit one to advertise, label and sell germicide as ''The most efficacious remedy known; an absolute remedy for; and the greatest remedy known for mildew, fungus, curl-leaf, thrips, aphis, codlin-moth, eggs and larvae of pests and insects, etc.,'' when in truth such compound is not efficacious for any of such purposes, and is of little or no use for such purposes, would be a direct violation of the letter and spirit of the Economic Poison Act of California. Moreover, it would be encouraging fraud and imposition upon the public. [9] Even though an act may be unconstitutional, equity will not intervene to sanction a fraud or

gross imposition upon the public.    (*Jose* v. *Utley*, 185 Cal. 665 [199 Pac. 1037].)

Respondent asserts that the Economic Poison Act confers an illegal and unconstitutional arbitrary power upon the Director of Agriculture to revoke a license to sell such commodity, and thus deprive him of the right to follow a lawful pursuit.   He cites the case of *Los Angeles* v. *Hollywood Cemetery Assn.*, 124 Cal. 344 [71 Am. St. Rep. 75, 57 Pac. 153], in which it was held that a city ordinance prohibiting the locating and maintaining of a cemetery for the burial of the dead within the county without permission of the supervisors was void.   In the course of the opinion this language is used: "The supervisors may impose a license, the payment of which shall be a condition to the enjoyment of the privilege of engaging in lawful occupations; they may regulate the manner of conducting the business if it be of a character tending to be injurious; but if the business be lawful, and having no injurious tendency, they cannot say who shall or who shall not exercise the right itself. Under the guise of regulating a business the municipality cannot make prohibition possible by committing to the officers of the municipalities the arbitrary power to deny permission to engage in that business.   We do not think it was ever intended by the people in ordering the section of the constitution referred to, or of the legislature in the statutory enactment, to include in the power to make and enforce regulation a power purely personal and arbitrary. For, as was said in *Yick* v. *Hopkins*, 118 U. S. 356 [30 L. Ed. 220, 6 Sup. Ct. Rep. 1064, see, also, Rose's U. S. Notes], the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery."

It will be noted that the language last quoted of Mr. Justice Matthews of the United States supreme court was used with reference to an ordinance of San Francisco prohibiting the maintenance of the lawful and useful business of a laundry, unless it be conducted in a brick or stone building.   The cause for criticism of such an ordinance is quite apparent.   And in the language used by the court in the Hollywood cemetery case, above quoted, it will be noted

that the court says: "The supervisors may impose a license, the payment of which shall be a condition to the enjoyment of the privilege of engaging in lawful occupations; they may regulate the manner of conducting the business if it be of a character tending to be injurious."

The "regulation of a business tending to be injurious" is precisely what the legislature attempted to do by the enactment of the Economic Poison Act. The handling of poisons in nearly every form is recognized as dangerous and likely to become injurious unless carefully regulated. The economical poisons used to eradicate germs and pests from plants and trees, unless scientifically used, may be most injurious. On the contrary, for the benefit of the large and important fruit interests of California, such germicides are of inestimable value. It is for an alleged violation of the reasonable regulations and restrictions provided, not by the Director of Agriculture, but by the legislature, that respondent was cited to show cause why his license should not be revoked. In this procedure there is nothing in conflict with the law announced by the court in the case of *Los Angeles* v. *Hollywood Cemetery Assn.*

So, also, the respondent cites with assurance the case of *Howlett* v. *State Board of Medical Examiners,* 148 Cal. 590 [113 Am. St. Rep. 315, 7 Ann. Cas. 750, 3 L. R. A. (N. S.) 896, 84 Pac. 39]. Pursuant to the authority vested in the state board of medical examiners to revoke the license of a physician for "unprofessional conduct," which was defined, among other things, as consisting of "all advertising of medical business in which grossly improbable statements are made," the license of a Los Angeles physician was revoked. It appears that because this physician had advertised as follows: "cancer cured; the only sure cure known in the world," her license was revoked. The court held that the question as to what constituted "grossly improbable statements" was indefinite and uncertain; and that one should not be deprived of the right to practice the profession for which they had consumed a lifetime to prepare, merely because some commission might think the advertised statement was "grossly improbable." It is quite apparent that among the many different schools of medicine there would be bound to exist a grave difference of opinion as to what might constitute a cure for cancer or any other chronic disease.

But suppose the medical act in question had authorized the revocation of a physician's license for unprofessional conduct, and had defined such conduct as, for instance, prescribing for any disease a remedy supplied in a container upon which a false label as to its contents was used; and that the physician had supplied, in treatment for a malignant internal disease such as cancer, bread pills in a package labeled "cancer cured; the only sure cure known in the world"? Can it be said that the court, under such circumstances, would have held that such conduct would not justify the revocation of his license for unprofessional conduct? There would then be no uncertainty as to the deceit or the damage that would follow such conduct. A chemical analysis would disclose the fact that the alleged "cancer cure" was nothing but bread pills. There could be no diversity of opinion as to the lack of efficiency of the remedy supplied. While the credulous patient was slowly dying under the treatment of bread pills, except for the deceit of the physician the patient might have been receiving helpful treatment.

Advertising what may be "grossly improbable" is quite different from supplying a poison misbranded and misrepresented, particularly when the commodity is of "little or no value" for the purpose for which it is advertised and sold.

[10] The authorities are practically uniform to the effect that a court should not declare a statute unconstitutional unless it is clearly and palpably so and is incapable of reconciliation. (5 Cal. Jur. 612.)

[11] Article I, section 11, of the constitution provides that "All laws of a general nature shall have a uniform operation." This does not mean that the law shall operate alike upon all persons, but that it shall affect all persons uniformly who stand in the same category or upon those who stand in the same relation with respect to the particular privileges and immunities conferred by the act. (5 Cal. Jur. 816.) [12] But this Economic Poison Act purports to operate uniformly upon all persons who "manufacture, sell or use economic poisons." It certainly is not special legislation. In the leading case of *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 560 [46 L. Ed. 690, 22 Sup. Ct. Rep. 439, see, also, Rose's U. S. Notes], Mr. Justice Harlan says: "Classification must rest upon some difference which bears a

reasonable and just relation to the act in' respect to which
the classification is proposed, and can never be made ar-
bitrarily." [13] But in determining the legality of classi-
fication for legislative regulation there should be considered
the general subject to be regulated, its character, extent and
purpose, together with those who would be naturally affected
thereby. (6 R. C. L. 375; *Ex parte Jentzsch,* 112 Cal. 468,
474 [32 L. R. A. 664, 44 Pac. 803].) The last case cited
held an act purporting to make it a misdemeanor for any-
one to work in or conduct a barber-shop on Sunday to be
void. The reason is apparent. There is no natural reason
for segregating barbers from other employments and pro-
hibiting them from working on a particular day. But there
is good and natural reasons for regulating the business of
handling and selling economic poisons. This classification
is natural and valid.

[14] Conferring upon the Director of Agriculture the
duty to regulate the manufacture, sale and use of economic
poisons, together with the means of enforcing this act by
licensing, or revoking the licenses of dealers, does not violate
the provisions of article III of the constitution, nor article
VI, section 1, of that document. It is well established that
tribunals, such as the board of medical examiners and
similar boards empowered to regulate business and affairs
under the police powers, are not exercising judicial authority
within the meaning of said provisions. Statutes creating
such authority and conferring such powers upon such
officers are constitutional and valid. (*Suckow* v. *Alderson,*
182 Cal. 250 [187 Pac. 965]; *Brecheen* v. *Riley,* 187 Cal.
121 [200 Pac. 1042]; *Los Angeles* v. *Spencer,* 126 Cal. 670
[77 Am. St. Rep. 217, 59 Pac. 202]; *Ex parte Whitley,* 144
Cal. 167 [1 Ann. Cas. 13, 77 Pac. 879]; *Lanterman* v. *An-
derson,* 36 Cal. App. 472 [172 Pac. 625].) Nor is the power
so conferred upon the Director of Agriculture arbitrary and
final. He can act only pursuant to law, after notice. He
acts in a *quasi*-judicial capacity only, and his decisions are
subject to review on *certiorari.* (*Suckow* v. *Alderson,* 182
Cal. 250 [187 Pac. 965]; *Lanterman* v. *Anderson,* 36 Cal.
App. 472 [172 Pac. 625].) [15] Nor does the power con-
ferred by this act to revoke a license for violation of the pro-
visions of the act, infringe upon the inhibition of article I,
section 14, of the constitution of California, or the four-

teenth amendment to the constitution of the United States, prohibiting the taking of private property without due process of law. [16] Due process of law does not necessarily mean that a person is entitled to a trial in a court before he may be deprived of what may be equivalent to property rights. It does, however, mean that an orderly proceeding adapted to the nature of the case, shall be accorded to the owner of property, in which he may be heard, and where he may defend, enforce and protect his personal rights. . (*Santa Clara* v. *Southern Pacific Ry. Co.,* 18 Fed. 385.) [17] The general right to engage in a trade, profession or business is subject to the power inherent .in the state to make necessary rules and regulations respecting the use and enjoyment of property necessary for the preservation of the public health, morals, comfort, order and safety; such regulations do not deprive owners of property without due process of law. (12 C. J., p. 1272, sec. 1074.) [18] No person can acquire a vested right to continue, when once licensed, in a business, trade or occupation which is subject to legislative control under the police powers. (6 R. C. L., p. 482, sec. 481; *Hurtado* v. *California,* 110 U. S. 516 [28 L. Ed. 232, 4 Sup. Ct. Rep. 111, see, also, Rose's U. S. Notes].) [19] Nor do we think the Economic Poison Act is in violation of article I, section 7, of the constitution of California guaranteeing a trial by jury. The trial by jury is assured in only such cases as existed at common law. (*Koppikus* v. *State Capitol Com.,* 16 Cal. 248.) A jury trial may not be demanded in special proceedings, unless the right is given by statute. (15 Cal. Jur. 342.) [20] Statutes are not unconstitutional which provide for the revocation of licenses and permits. (35 C. J. 185; *Bowman* v. *Virginia State Entomologist,* 128 Va. 351 [105 S. E. 141].) Nor do we find that the act in question infringes upon any of the constitutional provisions relied upon by petitioner.

The regulation of the use and sale of economic poisons for the evident purpose intended by this statute of 1921 is akin to,.and probably more important than the statutes regulating fertilizers. Yet in 1 Ruling Case Law at page 789, the able author says: "One of the most common instances of the existence of the exercise of police powers in reference to agriculture is the regulation of the sale of commercial fertilizers. The controlling purpose of such statutes is to

guard the agricultural public against the spurious and worthless compounds sometimes sold as fertilizers, and to fix on sellers a statutory guaranty that fertilizers sold by them shall contain the chemical ingredients as represented, thus furnishing to purchasers a reliable means of proving any deception thus attempted. As these statutes prevent fraud, and promote the prosperity of agricultural industry, they are strictly within the scope of legitimate police regulation.'' (2 C. J. 999.)

[21] Even though the Economic Poison Act were open to attack as an unconstitutional delegation of power, this petitioner is estopped from making such defense. For several years past he has registered his ''Qua-Sul'' product, and has been licensed to manufacture and sell the same. He was licensed for the year 1923, and enjoying the protection of the very statute, at the time he challenges its constitutionality. One who elects to accept the benefits of a statute, is estopped from denying its validity. In the case of *Cofman* v. *Ousterhous,* 40 N. D. 390 [18 A. L. R. 219, 168 N. W. 826], where a license to conduct a dairy was revoked under a statute, by the dairy commission, in an appeal to the district court on *certiorari,* it was said: ''Nor in any event can the relator question the right of the Dairy Commissioner to cancel the license on the ground of the unconstitutionality of the act. . . . It is clear indeed that a person who obtains a license under a law, and seeks for a time to enjoy the benefits thereof, cannot afterwards question the constitutionality of the act when the license is sought to be revoked.'' (*M. & St. P. Ry. Co.* v. *Nester,* 3 N. D. 480 [57 N. W. 510]; *Hart* v. *Folsom,* 70 N. H. 213 [47 Atl. 603]; *State* v. *Seebold,* 192 Mo. 720 [19 Ann. Cas. 183, 91 S. W. 491].)

For the foregoing reasons the judgment is reversed. The trial court is directed to sustain the demurrer.

Finch, P. J., and Plummer, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 17, 1925.