[L. A. No. 16443.   In Bank.—May 31, 1938.]

LEWIS S. HART et al., Appellants, v. CITY OF BEVERLY HILLS (a Municipal Corporation) et al., Respondents.

Desser & Rau, Michael I. Nessen, Milton N. Sherman and Jack L. Rau for Appellants.

Richard C. Waltz, City Attorney, C. Richard Maddox, Assistant City Attorney, for Respondents.

Everett W. Mattoon, County Counsel, and Beach Vasey, Deputy County Counsel, as *Amici Curiae*, on Behalf of Respondents.

HOUSER, J.—From the record herein, it appears that by the terms of a zoning ordinance, a specified portion of the City of Beverly Hills is set apart as a residential district. In substance, by the terms of a separate ordinance of said city it is provided that no auction sale of personal property shall be held in such an area, but that "all auction sales except for the sale of real property are required to be held in the retail business district, . . . " It further appears that Andrew Rice maintains his home in a residential district of said city; that at a time after said last-mentioned ordinance became effective and was in force, he employed one Lewis S. Hart to conduct at said residence an auction sale of certain household goods of which Rice was then the owner,—in pursuance of which Hart made application to the said city for a license to conduct said auction sale at the home of said Rice, and thereupon, in proposed payment thereof, tendered to the said city the sum of $10 which was the appropriate fee for that privilege, in accordance with the requirements of the said ordinance. The said city refused to accept the fee so tendered, or to issue to said Hart a license for which he had thus applied. Thereupon, on the application of the said Rice and Hart, an alternative writ of mandate was issued out of the superior court in and for the county of Los Angeles, by which the respondent city and its proper officials were required either to issue to the said petitioners a license to sell the aforementioned personal property at auction, or on a date specified, to show cause why they should not do so. A general demurrer to the application for the writ which was interposed by the said defendants was sustained "without leave to amend". It is from the ensuing judgment that the instant appeal has been presented to this court.

Appellants contend. that the ordinance is unconstitutional in that it is in violation of the guaranties of their personal rights which are expressly conferred upon them both by the provisions that are contained in section 13 of article I of the state Constitution, and in the Fourteenth Amendment to the Constitution of the United States, in that the effect of the ordinance is to deprive them of their property "without due process of law".

By judicial determination, evidenced by many legal precedents, the principle of law is thoroughly established that the constitutional rights of the individual to acquire and to possess property includes the right to dispose of it,—ordinarily in such innocent manner as he may see fit to do so, and that no statutory restriction upon such personal liberty is permissible, excepting only in that regard, that the exercise of the police power may be invoked in derogation thereof when it is founded upon valid and substantial considerations relative to the health, the morals, the safety or the "general welfare" of the public. (*Ex parte Quarg,* 149 Cal. 79 [84 Pac. 766, 117 Am. St. Rep. 115, 9 Ann. Cas. 747, 5 L. R. A. (N. S.) 183]; 8 Cyc., p. 886; *People* v. *Davenport,* 21 Cal. App. (2d) 292, 296 [69 Pac. (2d) 862]; *Roystone Co.* v. *Darling,* 171 Cal. 526, 532 [154 Pac. 15]; 12 C. J., pp. 945, 946; 5 Cal. Jur., pp. 728, 729; *People* v. *Pace,* 73 Cal. App. 548 [238 Pac. 1089]; *People* v. *Bosse,* 21 Cal. App. (2d) 276 [68 Pac. (2d) 990]; *Matter of Yun Quong,* 159 Cal. 508, 511 [114 Pac. 835, Ann. Cas. 1912C, 969].)

But it is not with reference either to the expression of principles of the law, or to a desire to jealously safeguard human liberties, that the respective parties to the instant controversy are at issue. Each of the representatives of the parties to this proceeding is learned in his profession, and each vies with the other in the extent or the proportion of his devotion to protection from encroachment by legislative enactment upon the constitutional personal rights of the individual. In the abstract, the line of demarkation between the respective parties is indicated merely by a difference in opinion with respect to the proper application of the constitutional guaranty to the facts before this tribunal. More particularly, on the one hand, the discussion relates to a consideration of the question of the limitations that properly should attach to the exercise of the police power, as judicially construed

to embrace statutes enacted in the interest of health, morals, safety, or the "general welfare" of the public; and on the other, to a reflection concerning the apparently increasing tendency to expand and to accord the utmost elasticity to the power to legislate on a subject where either the avowed or the implied purpose is to promote the well-being of humanity; and as an incidental and possible consequence regarding the latter situation, it is asserted that, pursuant to such tendency and on suitable occasion, not only may constitutional guaranties be distorted beyond recognition of their original intent and purpose, but if deemed advisable or expedient by such legislative bodies, they may be utterly disregarded. Covering a period of decades, the exercise of the police power was limited to conditions wherein either the health, the morals, or the safety of the general public was seriously and unquestionably involved. As long as any or either of such requirements were or was respectively maintained, personal liberties were not seriously endangered,— but not so, necessarily, upon the advent of the addition of the element of "general welfare" to those constituents which theretofore solely had constituted a justifiable excuse of warranty for the destruction of natural rights. It is obvious that in its liberal and untrammeled construction, "general welfare" has an infinite range,—nearly, if not as completely beyond the contemplation of the human mind as is the universe itself. At least, it is so inclusive that to ordinary intelligence, its scope is all-embracing and impossible of limitation. In its simplicity, it knows no bounds; it is as changeable as the "vagrant breeze". That which to one generation might appear to be most promising of the public good, by the succeeding might be denounced as so harmful as to constitute a public menace.

Thus, if the meaning of the words "general welfare" be accorded their utmost significance, the original "due process" protector of human rights may be so endangered by the attacks made thereon by the "police power" destroyer that, considering present legislative tendencies, within the lives of those now in being, if utter annihilation of the substance of constitutional guaranties do not ensue, no more than a shadow ultimately may remain.

■ In actual practice, and in the first instance, the necessary determination of the substantial effect resulting from

legislation to be enacted under the guise of the police power, with reference to the "general welfare" of the public, theoretically confided to the sound judgment of a wise and capable legislative body, in reality and eventually, may reside either in scheming and corrupt politicians, or in a careless or a fanatical constituency, with the consequence that the public good may become "the mob's football". But such results may ensue only in the absence of conservative and conscientious judicial construction and interpretation of legislative acts. As hereinbefore has been indicated, it should be noted that the words "general welfare" have been grafted upon the original stock of "health, morals and safety", with the resulting incident that they must be interpreted in accord with the rule that requires that when words of a general character follow those of special meaning the former must be governed in their significance by that which inheres in the latter. Otherwise stated, in the construction of a statute, special words employed therein are the guiding, if not the controlling force as regards general and succeeding words. (Sec. 3534, Civ. Code; *Hunt* v. *Manning,* 24 Cal. App. 44 [140 Pac. 39]; *In re Johnson,* 167 Cal. 142 [138 Pac. 740]; *In re Flesher,* 81 Cal. App. 128 [252 Pac. 1057]; *Pasadena University* v. *County of Los Angeles,* 190 Cal. 786 [214 Pac. 868]; *Coleman* v. *City of Oakland,* 110 Cal. App. 715 [295 Pac. 59]; *People* v. *McKean,* 76 Cal. App. 114 [243 Pac. 898]; *Fisher* v. *Los Angeles Pac. Co.,* 21 Cal. App. 677 [132 Pac. 767]; 23 Cal. Jur., pp. 755, 756; *In re Marquez,* 3 Cal. (2d) 625, 629 [45 Pac. (2d) 342].) With such reversion to legal principles of statutory construction, their application to the instant situation must result in the conclusion that the inclusion of the words "general welfare" as an element either essential, or which may be relied upon as affording a justification for that which otherwise properly might be termed a violation of the personal rights of the individual, has the effect only of enlarging or expanding the significance that formerly was deemed properly attachable to the grounds originally deemed necessary to the expedient exercise of the police power of the state. In such a light, were it not for that which by eminent authority repeatedly has been shed in similar situations, it might be deemed appropriate meticulously to inquire into, and to determine as accurately as practicable, the "metes and bounds" of the words "health, morals and safety",

as modified and perhaps liberalized by the additional words "general welfare" when applied to legislation initiated and enacted with the express or the implied intention of exercising the police power of the state in derogation of individual, vested and personal rights guaranteed by constitutional provision. ▮ In that regard, the formulated rule seems well established in substance, that a statute having been enacted, the presumption will be indulged not only that it was inspired by a general intention to add needed protection to the health, morals, or safety of the public, but that the statute would be corrective of some specific, if not specified evil;— from which significant, if not controlling influence, has been evolved the additional principle that unless the questioned legislation bears the unmistakable imprint of arbitrary or oppressive action on the part of the legislators, or some characteristic inducement closely akin thereto, the statute must be deemed to have been enacted in accordance with the implied powers of the legislative body. In other words, no presumption of invalidity of the statute will obtain; but to the contrary, every intendment will be indulged in favor of its validity. (23 Cal. Jur. 783, 5 Cal. Jur. 628, *Rainey* v. *Michel,* 6 Cal. (2d) 259 [57 Pac. (2d) 932, 105 A. L. R. 148]; *Cuthbert* v. *Woodman,* 185 Cal. 43 [195 Pac. 673], *People* v. *Hayne,* 83 Cal. 111 [23 Pac. 1, 17 Am. St. Rep. 211, 7 L. R. A. 348], *Galeener* v. *Honeycutt,* 173 Cal. 100, 103 [159 Pac. 595], *E. Clemens Horst Co.* v. *Industrial Acc. Com.,* 184 Cal. 180, 193 [193 Pac. 105, 16 A. L. R. 611], *In re Makings,* 78 Cal. App. 58 [247 Pac. 923], *In re Spencer,* 149 Cal. 396 [86 Pac. 896, 117 Am. St. Rep. 137, 9 Ann. Cas. 1105], and *Title etc. Restoration Co.* v. *Kerrigan,* 150 Cal. 289 [88 Pac. 356, 119 Am. St. Rep. 199, 8 L. R. A. (N. S.) 682].)

In the application to the instant situation of such thoroughly recognized legal principles, and in the absence of any showing on the part of the appellants that in the adoption of the questioned ordinance there obtained or was present any semblance of conditions of that adverse and deleterious character to which reference hereinbefore has been had, inevitably the validity of the ordinance should be adjudged.

▮ But apart and aside from implied legal inducement for the adoption of the ordinance, the questioned action of the legislative body may be entirely justified on the assumption that as a matter of fact it was in response to a laudable

suggestion that it would tend not only to the greater safety of the general public, not only from a standpoint of protection of its members from physical injury, but also from the possibility of their being the individual victims of fraud or crime. It is common knowledge of which a reviewing tribunal may take judicial notice, that the City of Beverly Hills is the place of residence of numerous ''stars'' and ''executives'' of the motion picture industry. Ordinarily, a well-advertised auction sale of personal property will attract a motely throng, not only of possibly intending purchasers, but also of the curious and of idle and unemployable persons. Where great crowds are gathered, with the prevailing necessary incident of automobile transportation, accidents are almost inevitable, with usual resulting injury to persons and to property. Furthermore, with regard to a sale at auction in said city, of the personal effects of persons who are well known to the public, among whom may be ''stars'' of the motion picture profession, it is asserted that heretofore, by unscrupulous persons in charge of such a sale, upon occasion, articles of merchandise from retail establishments have been intermingled with the personal effects of the owner thereof, and thereupon have been represented to the purchasing public and offered for sale as, the personal property of the ''star'' or other well-known person whose effects were the subject of such auction sale. An implied fraud may thus have resulted to an enthusiastic bidder, who in his admiration perhaps, for the person whose property presumably was being sold, may have been induced to pay much more for a given article than its real or its sentimental value warranted. With regard to such a situation, in the case of *Cofman* v. *Ousterhous,* 40 N. D. 390 [168 N. W. 826, 18 A. L. R. 219], it was said: ''The police power of the state is not limited to the regulations necessary 'for the preservation of good order or the public health or safety. The prevention of fraud and deceit, cheating and imposition, is equally within the power, and a state may prescribe all such regulations as in its judgment will secure, or tend to secure, the people against the consequences of fraud'.'' An opportunity also is presented for operation by the pilferer, the pickpocket or even the ''finger man''. It therefore is readily conceivable that the ordinance of which complaint here is registered, resulted from an honest and praiseworthy effort on the part of the legisla-

tive body of the City of Beverly Hills to faithfully perform its official duty and better to insure the safety of its residents and the "sojourners within its gates".

But the validity of the ordinance need not be made to rest solely upon such grounds. Considering its language, the ordinance is not, nor does it purport to be, either destructive or confiscatory of the rights of the appellants. No inhibition may there be discovered regarding the right of the owner of the personal property to sell or "to dispose" of it. In effect, the ordinance is merely regulative of that right, in that it ordains that no auction sale of such personal property shall take place within a specified area of said city. The manner, together with the place of sale only are prescribed; the ultimate and controlling right of disposition remains wholly unaffected. In addition to the case of *Cofman* v. *Ousterhous, supra,* the legal precedents are legion which, although denying the power to a legislative body to destroy a given constitutional right, nevertheless accord full recognition to the authority to regulate its exercise. (*Riley* v. *Chambers,* 181 Cal. 589 [185 Pac. 855, 8 A. L. R. 418]; *Quong Ham Wah Co.* v. *Industrial Acc. Com.,* 184 Cal. 26, 37 [192 Pac. 1021, 12 A. L. R. 1190]; *Gregory* v. *Hecke,* 73 Cal. App. 268, 277, 278 [238 Pac. 787]; *In re Stoltenberg,* 21 Cal. App. 722 [132 Pac. 841]; *Graham* v. *Kingwell,* 218 Cal. 658 [24 Pac. (2d) 488]; 5 Cal. Jur., pp. 704, 705; *Greenberg* v. *Western Turf Assn.,* 148 Cal. 126 [82 Pac. 684, 113 Am. St. Rep. 216]; *Matter of Application of Barmore,* 174 Cal. 286 [163 Pac. 50, L. R. A. 1917D, 688].)

The judgment is affirmed.

Curtis, J., Seawell, J., and Waste, C. J., concurred.

Edmonds, J., and Langdon, J., concurred in the judgment.

Rehearing denied.