[Crim. No. 8356.   Second Dist., Div. Four.   Jan. 29, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLENE BEATRICE BEACH, Defendant and Appellant.

Russell E. Parsons and Ralph D. Paonessa for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—In an information filed by the District Attorney of the County of Los Angeles, defendant was charged with violation of section 192 of the Penal Code, manslaughter without malice. Defendant entered a plea of not guilty. Defendant and all counsel waived trial by jury and the matter was tried by the court. The court found defendant guilty of voluntary manslaughter. Probation was denied. Motion for a new trial was denied and defendant was sentenced to the state prison for the term prescribed by law.

It was stipulated that Dr. K. E. Chapman, a deputy county coroner was deemed to have been called, sworn and testified: on August 14, 1961, he performed an autopsy on the body of Thomas Beach, the victim; the cause of death was due to a gunshot wound in the abdomen.

Del L. Grant, a police officer, testified that on August 12, 1961, he was called to a residence at 8137 Hinds Avenue in Sun Valley. He arrived at the residence about 5:50 p.m. and saw a man later identified as the victim, Thomas Beach, lying on the floor; defendant Charlene Beatrice Beach was kneeling beside him. He noticed a small puncture wound in the area of the man's chest. The man was moaning and groaning. He observed a .22 caliber rifle lying on a counter separating the living room from the kitchen. There was an odor of gun powder about the gun. Defendant was rubbing victim's face with her hands and told the officer to "help him," "help him."

An ambulance was called. One of the ambulance crew asked if the man had shot himself. Defendant said, "no," that she had shot him. He asked her what was wrong and she said they had been fighting, drinking and arguing all day and he had hit her with a paddle. She said she went to the bedroom closet, obtained the rifle, went to a drawer and opened a box of shells, loaded the rifle and went to the kitchen to scare him, and he came at her. The next thing she knew, he

was grabbing his chest and falling to the floor. She said she did not recall shooting the gun. She said at first she thought he was "kidding" when he fell to the floor. She called the operator for an ambulance.

The officer further testified he examined the rifle. It contained two full rounds of ammunition and a shell which had been fired. The shells found in the rifle were the same type as came out of the bureau drawer. He had another conversation with the defendant. Defendant said she and her husband had been arguing and drinking. They had a couple of drinks; then an argument arose between them because her husband wanted Sandra, her daughter by a former marriage, to mow the lawn. Defendant further related that she told the victim she thought Sandra had enough responsibility and she shouldn't mow the lawn. She told her husband she wanted the two boys to mow the lawn. He told her he would settle the affair and handle Sandra after she left for work. Defendant further stated she was afraid to leave Sandra at the house so she called a former sister-in-law and asked her to come over and get the daughter, but the sister-in-law was unable to do so. She further related that at the time when she was in Sandra's room her husband came in with a paddle and whacked her twice on the rear portion of her legs; he kept encouraging her to drink; she did not want to drink; she would go out to the kitchen and pour the drinks down the sink. She kept telling him she needed some rest so she could go to work. She went into her bedroom, closed the door and her husband came in and threw some water on her. After this she got up from the bed and went to the closet to get the rifle. She repeated in substance her former statement of loading the rifle and of the shooting. She was asked by the officer if they had been having problems before and she replied, "Yes, we had been fighting for a couple of weeks and had many arguments." She further related she was not familiar with guns; this was the first time she had ever shot a gun; her husband had hit her twice before with the paddle, and had threatened to hit Sandra that day. The officer expressed the opinion that during the interview defendant seemed emotionally upset. He observed that she appeared to have some discoloration on the back of her neck.

T. H. Gerber, a police detective, testified he heard defendant say that her husband had beaten her that day, choked her, grabbed her by the hair, picked her up by the seat of the pants and threw her into the bedroom. He noted she had

marks on her neck which he thought showed evidence of choking. He further testified he also had a conversation with defendant on the day of the shooting. She repeated substantially the statements made to the other officer, adding that twice that day he had struck her on the back of the legs with the paddle when she refused to continue drinking with him; and he would fix her daughter Sandra after she went to work.

A police woman testified that she examined defendant's buttocks and rear portion of her thighs and found a red mark on the right side of her buttocks.

Defendant testified in her own behalf. Her testimony conformed with the statements she had made initially to the police. She added that when her husband was dissatisfied because he didn't like the job Sandra had done in mowing the lawn, he told Sandra to go out and mow it again. Sandra told him she was tired; she wanted to shampoo her hair. Sandra began screaming, "Mommy," "Mommy!" Defendant stated it was then that she got up and went into the room. Her husband had both Sandra's arms twisted behind her back. She told her husband, "Leave the child alone, she did what you asked." She told her husband she would ask their sons to finish the lawn. Her husband continued to drink and got worse and worse. She told Sandra, "We aren't going to argue with your dad. Go into your room, then you can set your hair." They went into her room. She was lying on the bed and Sandra was sitting at the foot of the bed when her husband came in a short time later and started twisting Sandra's arm. She told her husband to please go away, but he came over and started calling defendant names, took her arm and rolled her off the bed. He then began twisting her arm and striking her with the paddle; then he walked out of the room. He came in the second time and started calling her names and hitting her with the paddle. The boys then came in and told him, "Leave mother alone," and left the room. She went to the kitchen where there were some martinis mixed in a pitcher and poured them down the drain. Her husband got another bottle of gin and she poured it down the drain. She went to her bedroom to lie down, but her husband came in and threw a pitcher of water all over her. She followed him into the kitchen where he was beginning to mix more drinks. She took them and poured them down the drain. When she did that, he grabbed her by the head and seat of her shorts and threw her back into the bedroom saying, "I'll be back. I'm going to kill you and Sandra." "I've been through two wars. I

was a paratrooper and I have killed before. It wouldn't bother me at all."

She further testified she was afraid of her husband and had been afraid of him for more than two years. He had made many threats against their daughter Sandra. When he twisted Sandra's arm, he stated, "When you go to work, Charlene, I'll fix Sandra." She was fearful for Sandra's physical welfare. She told her daughter in his presence that she would have to take her to work with her.

She testified she did not remember the gun going off; that she certainly would not kill him; she remembered when she came out of the bedroom she had the gun in her possession and she saw her husband as he came out of the bedroom; that he looked real upset, his eyes large and he was "sort of shaky." She was frightened. She thought Sandra was in the bedroom; she was not quite sure. The gun discharged and her husband fell, sort of "clutching himself." She picked up the phone, called the operator, told her what had happened and asked her to send an ambulance. She got a washcloth, wet it and started bathing his forehead, got down on the floor and breathed in his mouth until the ambulance got there.

She further testified she picked up the gun and loaded it to defend herself, not to shoot him but with Sandra in mind, because she believed he was going to kill Sandra and her; she thought if she had the gun in her hand, it might calm him down and he would go away. Her husband was a rather large man, 6 feet tall, 180 or 190 pounds and in good health. He lifted weights every night, 150 pounds, over his head. He would do sit-ups and push-ups in the garage and was a man of more than usual strength.

Montie G. Williams testified he examined the .22 caliber rifle. It is a bolt operated or bolt action rifle. When in normal operating condition, the bolt is lifted on the right side, pulled to a rearward position, the pressure of the spring and internal mechanism causes one cartridge to pop up to position where the bolt being rammed home forces the cartridge into the breech; at the same time the weapon is automatically cocked for firing, unless the safety has been actuated. To fire the rifle, it is necessary only to pull the trigger.

Defendant contends:

The corpus delicti was not proved and therefore the court erred in receiving the statements of defendant in evidence. This contention is without merit.

492

In homicide, the corpus delicti may consist of the death of the alleged victim and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. "Proof of the corpus delicti does not require identity of the perpetrator. It is not necessary that it connect the defendant with the commission of the crime, although it may do so. [Citations.]" (*People* v. *Cullen*, 37 Cal.2d 614, 624 [234 P.2d 1].)

After such proof is made the confessions and admissions of defendant are admissible in evidence and may be weighed in conjunction with all other evidence to determine whether the corpus delicti and other elements of the crime have been proved beyond reasonable doubt. *People* v. *Gem Hang*, 131 Cal.App.2d 69, 71-72 [280 P.2d 28] puts the matter succinctly as follows: "Extrajudicial admissions of a defendant can be used against him when there is independent prima facie evidence of the corpus delicti. [Citations.] Slight proof of the corpus delicti is sufficient for this preliminary purpose. [Citations.] . . . When in this manner the admissions had become admissible they were sufficient to raise the quantity of proof beyond a reasonable doubt." (See *People* v. *Watson*, 198 Cal.App.2d 707, 710-711 [18 Cal. Rptr. 234].)

We feel the evidence was ample and sufficient to establish the corpus delicti. It is also to be noted that defendant took the stand in her own behalf and testified to all of the incidents of the crime; the quarrel of the parties; his abuse of her; of her going to the closet in her bedroom; removing the rifle from the place where it was ordinarily kept; going to the dresser and obtaining the shells; loading the rifle; walking down the hallway to the kitchen where the victim was standing at the time of the fatal shot and of his clutching himself and falling. True, she did not recall the actual firing of the gun, but this may be inferred from all the circumstances.

As stated in *People* v. *Ditson*, 57 Cal.2d 415, 445 [20 Cal. Rptr. 165, 369 P.2d 714] : "Furthermore, in connection with the sources and sufficiency of the evidence establishing the corpus delicti, it is noted that defendants . . . took the stand and testified to all the incidents of the crime : . . . Their testimony *in court* is not to be regarded either as extrajudicial admissions or as confessions—it is direct evidence competent for the proof of all elements of the crime . . .

It is, of course, elementary and unquestioned that a

defendant who chooses to *testify* is just as competent to establish the corpus delicti as any other witness. [Citations.]"

Defendant also contends the evidence was not sufficient to establish manslaughter. We find no merit in this contention. Voluntary manslaughter is "the unlawful killing of a human being without malice . . . upon a sudden quarrel or heat of passion." (Pen. Code, § 192.)

"The fundamental of the inquiry in determining whether a homicide is voluntary manslaughter is whether the defendant's reason was, at the time of his act, disturbed or obscured by some passion—not necessarily fear, and never the passion for revenge—to such an extent as would render *an ordinary man of average disposition* likely to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. [Citation.]" (*People* v. *Brubaker,* 53 Cal.2d 37, 44 [346 P.2d 8].)

As we view the evidence, the trial court could reasonably conclude that defendant was roused to a heat of "passion" by the series of events transpiring before the fatal shooting. The evidence supports the finding by the trial court that defendant killed without malice but upon a sudden quarrel and heat of passion.

Defendant urged to the trial court the theories that (1) she killed in self-defense and (2) that the killing was accidental. The trial court heard the evidence and rejected both of the defense theories.

The weight of the evidence and credibility of the witnesses are not reviewable by this court. (*People* v. *Williams,* 150 Cal.App.2d 171, 176 [309 P.2d 525].)

The purported appeal from the order denying motion for a new trial is dismissed. Judgment of conviction is affirmed.

Burke, P. J., and Bishop, J. pro tem.,* concurred.

A petition for a rehearing was denied February 18, 1963, and appellant's petition for a hearing by the Supreme Court was denied March 27, 1963.

---

*Retired judge of the superior court sitting pro tempore under assignment by the Chairman of the Judicial Council.