[Crim. No. 13249.   In Bank.   Sept. 3, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GERALDINE JEAN SPENCER, Defendant and Appellant.

Harry E. Weiss and Leon Mayer for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Arnold O. Overoye and Jon A. Shoenberger, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant Geraldine Jean Spencer was charged by information with manslaughter (Pen. Code, § 192). After trial to the court, sitting without a jury, defendant was found guilty of voluntary manslaughter (Pen. Code, § 192, subd. 1) and was sentenced to state prison for the term prescribed by law. She appeals from the judgment of conviction.[1]

---

[1]Defendant appeals ''from the verdict and judgment of conviction and the sentence imposed . . . .'' Since the case was tried to the court sitting without a jury, there was no verdict. Had there been a verdict, no appeal

Defendant and the victim Amelia Ortega, also known as Emily Ortega, were lesbians who had lived together as such for a period of four years prior to Emily's death. Their relationship often erupted into violence, usually after one or both had been drinking. Numerous witnesses called by both prosecution and defense testified to prior quarrels between defendant and Emily in the course of which one of the women was cut or stabbed by the other with a knife. Emily, the larger of the two, was usually the aggressor, but on occasions defendant attacked Emily. There was also evidence that defendant had at least once threatened to kill Emily.

At 3 p.m. on May 4, 1967, defendant went to work at the Jaguar Bar and Cafe in Bakersfield, an establishment owned by Emily and defendant, which served food and beer. Emily arrived about 10 or 11 p.m. and drank two beers very rapidly. There was evidence that Emily did not appear to be intoxicated when she came into the cafe; there was also evidence that prior to her arrival she and another woman had consumed a quantity of vodka and whiskey as a result of which Emily was in a condition described as "glowing." Apparently nothing unusual transpired between defendant and Emily from the time the latter entered the cafe until approximately 2:05 a.m. on May 5. The only persons then present were defendant, Emily, Berta Swain, who was both cook and bartender, and a customer sitting at one of the tables who was unconscious from drinking.

At that point while the three women were cleaning up the cafe, Emily and defendant engaged in a brief verbal argument which reached a climax when Emily threw a glass of beer in defendant's face, slammed the glass down causing it to break, and walked outside talking in a confused manner. While defendant was washing off the beer, Emily re-entered the bar, pulled defendant by the hair and grabbed her by the neck. Berta Swain, who was sweeping the floor in another part of the establishment, heard defendant calling for help. Concluding that defendant was getting the worst of the struggle, Berta pushed the women apart and told Emily to leave defendant alone. Berta testified that neither of the

would lie from it. (*People* v. *Gotham* (1960) 185 Cal.App.2d 47, 50 [8 Cal.Rptr. 20].) In any event, the attempted appeal from the "verdict" must be dismissed. The appeal from the "sentence" is the same as the appeal from the judgment since in a criminal action the terms are synonymous. (*People* v. *Perkins* (1957) 147 Cal.App.2d 793, 797 [305 P.2d 932]; *People* v. *Tokich* (1954) 128 Cal.App.2d 515, 519 [275 P.2d 816].)

women had any weapons in their hands although she did notice what appeared to be a broken glass on the floor. She also observed that defendant's hair was wet. After this episode, Emily again went outside.

A short time later, Berta, who had gone back to her sweeping, again heard defendant and Emily quarreling. The latter had re-entered the bar and both women were standing by the side door. They were not engaged in a physical struggle; neither of them held any kind of weapon. For some unexplained reason, Berta then left the cafe and did not see the events thereafter taking place.

The only evidence of the circumstances of the killing itself was derived from a statement given by defendant five days later in the presence of her attorney to an investigator of the district attorney's office. The statement was taken down by a reporter and transcribed, and a copy was admitted in evidence and read into the record.[2] So far as is here pertinent defendant stated in substance as follows: During the course of the argument last referred to defendant ran into the kitchen and closed the door behind her. While she was standing at a worktable with her back to the door, she heard Emily enter the kitchen. Defendant looked over her shoulder and saw Emily "charging at" her. She cried out "Emily, please leave me alone," or "Keep away from me." Although defendant did not remember picking up a knife from the table, when she turned around and saw Emily coming at her, defendant had a knife in her hand. Emily did not appear to have anything in her hands. According to defendant the stabbing occurred, "Right at that point. That is when it happened . . . Then she jumped away and I saw the blood. I dropped the knife right by the table and I screamed."

By this time Berta Swaih had walked around the outside of the cafe toward her car in front of the building. She heard defendant screaming her name and through a window saw defendant running toward the front door. Defendant opened the door and called to Berta to summon an ambulance. After doing so, Berta went into the kitchen and saw Emily lying on the floor with defendant kneeling beside her. At the trial

---

[2]Pursuant to stipulation the case was submitted on the transcript of the preliminary hearing together with additional testimony adduced at the trial. Defendant did not take the stand at the trial. Although she testified at the preliminary hearing, the scope of her testimony did not encompass the circumstances of Emily's death. Thus the sole evidence thereof is gleaned from defendant's pretrial statement. No challenge as to its validity or its admission is made on this appeal.

Berta testified for the defense that she knelt over Emily and thought she heard Emily say "something about she [defendant] didn't mean to do it." Berta denied, however, that she heard Emily say it was an accident. For purposes of impeachment, the defense called four witnesses who testified that Berta had told them that Emily had said the stabbing was an accident.

Dr. Tilden Moe, associate pathologist at the Kern County General Hospital, performed an autopsy on Emily Ortega between 9 and 10 a.m. on May 5. He testified that upon Emily's arrival at the hospital, surgery had been performed on her in an attempt to save her life but that she died from irreversible shock due to severe blood loss caused by a stab wound above the navel. He also found a laceration in the upper abdominal aorta and indicated that the surgeon had found that a portion of Emily's liver had been lacerated. Doctor Moe opined that it was possible that Emily could have inflicted the injuries upon herself by running against a knife held by another person if the knife was held rigidly. He also indicated that at the time of the autopsy Emily's spinal fluid contained 128 milligrams percent alcohol.

The prosecution tried the case on the theory that defendant killed Emily in the heat of passion. The defense claim of self-defense and lack of criminal intent rested on the theory that Emily inflicted the wound upon herself by running against the knife which defendant merely held in her hand.

At the outset we are confronted with defendant's assertion that the evidence is insufficient to sustain her conviction of voluntary manslaughter. ▪ Before we may set aside a judgment on the basis of insufficiency of the evidence, " 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.' " (*People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778].) ▪ The evidence as set forth above clearly is sufficient to sustain the trial court's conclusion that defendant killed Emily "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. 1.) ▪ The fact that it also might be sufficient to sustain a finding that the stabbing was done in self-defense does not provide grounds for reversal of the judgment, for " [i]f the circumstances reasonably justify the [judgment], the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant

will not warrant interference with the determination of the [trier of fact].'' (*Ibid.*)

Of more consequence is defendant's claim that certain evidence introduced by the prosecution in rebuttal was violative of the rule of *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111] cert. den. (1969) 393 U.S. 1051 [21 L.Ed.2d 693, 89 S.Ct. 679].)

We set forth the pertinent facts. As previously indicated, Berta Swain testified for the defense as to the events surrounding the killing. On cross-examination by the prosecutor, Berta was asked if she recalled talking on May 5 with Emily's sister, Lillian Moreno. She replied that she did. She was then asked: ''Do you remember telling on that day to Lillian, that during the course of that quarrel that earlier during the early morning hours [of May 5], that Geraldine Spencer broke a beer bottle . . . And made a statement that she was going to get Emily with it?'' Berta replied that she did not recall making such a statement.[3] In rebuttal, the prosecutor called Lillian Moreno who testified that on May 5, Berta told her, ''that she [Berta] saw everything, that [defendant] picked up a bottle—picked up a bottle, a beer bottle, and broke it on the edge of the bar and was going to come towards my sister, Emily Ortega, and I [*sic*] told her that she was going to get it. That is what she told me.''[4]

There can be no doubt that if Berta's extrajudicial statement was admitted under Evidence Code section 1235[5] for

---

[3]When the prosecutor completed his re-cross-examination of Berta he requested that she not be excused from giving further testimony in the case. His request was granted as is evident from the following colloquy between himself and the court:

''Mr. Allen [district attorney]: . . . I would like this witness ordered to remain until excused.

''The Court: All right . . .

''Mr. Allen: This witness may be called again.

''The Court: You had better remain outside until we decide whether we need you.''

[4]It is clear that the prosecution introduced Berta's alleged extrajudicial statement on the basis that it referred to defendant's actions at a time immediately preceding the killing. This is evident from the following questions asked Lillian Moreno by the prosecutor preliminarily to eliciting from her the substance of Berta's statement: ''Did you have occasion to talk to [Berta Swain] about the events *immediately surrounding. Emily's death*? . . . Did [Berta Swain] make a statement to you as to what happened *at the time*? . . . Would you tell us what she said happened *at the time*?'' (Italics added.)

[5]Section 1235 provides: ''Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770.''

Section 770 provides: ''Unless the interests of justice otherwise re-

substantive use, it was error under *Johnson*.[6] In that case holding that section 1235 as applied to criminal cases is unconstitutional, we explained that prior inconsistent statements of a witness, while admissible for impeachment purposes, cannot be given substantive use in a criminal trial because to do so would deprive the defendant of his constitutional right of confrontation guaranteed to him by the Sixth Amendment to the United States Constitution. We pointed out that the opportunity to cross-examine a witness at trial about a statement previously made by him out of court is not cross-examination which is constitutionally adequate. (68 Cal.2d at p. 660. See *Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318]; *People* v. *Green* (1969) 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422].) Thus, if Berta's extrajudicial hearsay statement was admitted under section 1235 for its substantive use, such admission was clearly error since it is obvious that, Berta not having made the statement during any judicial proceeding, defendant of course did not have any opportunity to cross-examine her at the time the statement was made.[7]

Because the present case was tried to the court without a jury and the record is therefore devoid of instructions indicating how the statement was used the Attorney General argues: (1) that it is possible that the court admitted the

---

quire, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statements; or (b) The witness has not been excused from giving further testimony in the action.''

Hereafter, unless otherwise indicated, all section references are to the Evidence Code.

[6] The fact that defendant failed to object to the introduction of Lillian's testimony does not preclude her from raising error on appeal. *Johnson* worked a substantial change in the application of section 1235 and an objection by defendant at the time of trial would have been futile. (*People* v. *Odom* (1969) *ante*, pp. 709, 717 [78 Cal.Rptr. 873, 456 P.2d 145]; *People* v. *De Santiago* (1969) *ante*, pp. 18, 23 [76 Cal. Rptr. 809, 453 P.2d 353]; *People* v. *Kitchens* (1956) 46 Cal.2d 260, 262-263 [294 P.2d 17].)

[7] The rule of *Johnson* applies with greater force in the instant case for two reasons: First, in *Johnson* the hearsay declarant was under oath when the statement was made thus supplying at least a minimal assurance of its veracity whereas in the instant case Berta's prior inconsistent statement was made during a casual conversation with Lillian Moreno. Second, the hearsay statement herein was introduced through the testimony of a witness who had to depend upon her memory rather than upon a transcript of the statement as was used in *Johnson* and *Green*. These two additional factors increase the risks created by the lack of cross-examination.

statement as a spontaneous declaration under section 1240[8] rather than as a prior inconsistent statement under section 1235; and (2) that even if it was admitted under section 1235 there is no way of determining whether the court used it substantively or only for impeachment.

We do not believe that the statement allegedly made by Berta to Lillian Moreno was admitted under section 1240. The Law Revision Commission comment to section 1240 indicates that it was intended to be a codification of the so-called "res gestae" exception to the hearsay rule as set forth in *Showalter* v. *Western Pac. R.R. Co.* (1940) 16 Cal.2d 460 [106 P.2d 895]. This court there explained the rule to be "that declarations which are voluntary and spontaneous and *made so near the time of the principle act as to preclude the idea of deliberate design*, though not precisely concurrent in point of time therewith, are regarded as contemporaneous and admissible." (Italics added.) (16 Cal.2d at p. 465.) In expanding on the portion italicized above, we stated that "where a declaration is made under the immediate influence of the occurrence to which it relates and so near the time of that occurrence as to negative any probability of fabrication, said declaration is admissible." (*Showalter* v. *Western Pac. R.R. Co., supra*, 16 Cal.2d at p. 467.)

The People have not called to our attention, nor have we found, anything in the instant record giving any indication that Berta's extrajudicial statement was offered or received in evidence under section 1240. Absent such support in the record, we cannot assume that the admission of the statement rested upon and is justified by that section.

On the contrary we think that a fair reading of the record before us indicates that the only basis for the admission of the statement was under section 1235 as a prior inconsistent statement. Indeed, as we note below, the prosecutor's purpose in introducing the statement was to discredit Berta Swain's testimony on direct examination which corroborated defendant's statements in the record and supported the defense theory that Emily was the aggressor. Although Berta did not testify in so many words that Emily was the aggressor, nevertheless, the general tenor of her testimony was consistent with

---

[8]Section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

efendant's theory of the case and highly corroborative of hose portions of defendant's pretrial statement indicating cts of aggression by Emily.[9] Thus, the hearsay declaration vas inconsistent in effect with Berta's testimony on direct xamination in that it tended to indicate that defendant at

[9]The relevant portion of Berta's testimony on direct examination is s follows:

"Q [by defense attorney]: Okay, now, tell us about the first time, vhat you saw? A Well, they were just like——, I don't know how to xplain it, but they had ahold of each other, you might say, wrestling round only they were standing up, and they were——, was a glass thrown he first time. Q A glass thrown? A. Yes. Q Now, what did you see with eference to the glass? A That is when Gerry started yelling for me to elp and that was right after I heard the glass—at least—break and knew it was thrown because it was all over the floor, and she was holdng her head. THE COURT: Who was holding her head? A Gerry was olding her head and she was all wet, her hair was. Q Now, when you aw them struggling together, did either one of them ask for your as-istance? A Yes. Q Who asked for your assistance, Gerry or Emily? A Gerry. Q And what did Gerry say, or do you recall? A She was just elling, 'Berda, help me. Help me, Berda.' Q Emily wasn't asking for ny help? A No. Q Would you state who was——, seemed to be getting he best of the struggle when you intervened? A I would say Emily was, Q And then, did you go to Gerry's assistance? A Yes. Q Did you sepa-ate them? A Yes. Q Now, where did Gerry go after you separated hem? A She just backed away from us and I was standing next to Emily—I believe I had ahold of her arm—and Gerry backed off about, four or five feet. Q Then what happened. A Well, they seemed to settle lown and that is when Emily turned around and went out the door. Q And then what happened when Emily came back in, what did you say? A Well, I heard them scream and yell and when I turned around and ooked, they had ahold of each other again. Q Then what did you do, if anything? A I walked out the side door."

As previously indicated, the transcript of the testimony given at the preliminary hearing was also before the court. (See fn. 2, supra.) It is loteworthy that Berta's testimony given thereat as a witness for the People conveys the same general idea that Emily was the aggressor.

It is also obvious that the prosecution believed that Berta's testimony given on direct examination implicitly indicated that Emily was the aggressor. The foundational question asked of Berta on cross-examina-tion and the subsequent introduction of the testimony of Lillian Moreno impliedly acknowledged the substance of Berta's testimony and were attempts to rebut that testimony by showing acts of aggression by de-fendant.

As a further indication of the prosecution's evaluation of the evidence, we quote the following two portions of the Attorney General's brief:

"The evidence embodied in the testimony of the appellant and *the corroborating testimony of Mrs. Swain was strong proof that the victim was the aggressor at the time she was stabbed.*"

"As pointed out above, *the prosecution's purpose* in presenting this statement [i.e., Berta's hearsay statement made to Lillian Moreno] *was to rebut the appellant's claim that the victim was the aggressor* and the appellant killed in self-defense. The only bit of evidence other than Miss Moreno's testimony which tended to contradict the appellant's contention that the victim was the aggressor on the night she died was the extra-judicial statement [of Emily made on the night of the murder]." (Italics added.)

one time was the aggressor during the period of quarreling preceding the killing.

"It is not necessary that there should be contrariety in terms between the testimony given and the asserted impeaching statement. It is only necessary in order to render it admissible that the statement should have a tendency to contradict or disprove the testimony or any inference to be deduced from it." (*Hanton* v. *Pacific Elec. Ry. Co.* (1918) 178 Cal. 616, 619 [174 P. 61]; accord: *Worley* v. *Spreckels Bros. Commercial Co.* (1912) 163 Cal. 60, 72 [124 P. 697]; *Gregoriev* v. *Northwestern Pac. R.R. Co.* (1928) 95 Cal.App. 428, 438 [273 P. 76]. See 3 Wigmore on Evidence (3d ed. 1940), § 1040, pp. 725-726.) Thus, the statement was properly admitted for the purpose of impeaching the testimony given by Berta on direct examination.[10]

Since, therefore, the only possible basis for the admission of the statement was section 1235, we are confronted with the question whether the court limited its use to impeachment purposes or whether it also gave the statement substantive use as permitted by that section prior to our decision in *Johnson*. In *People* v. *Hopper* (1969) 268 Cal.App.2d 774 [75 Cal. Rptr. 253], the court, faced with the identical problem, determined that "[s]ince *People* v. *Johnson* had not yet restricted the scope of Evidence Code section 1235 in criminal cases, there was no apparent reason for the trial judge, as finder of fact, to abstain from considering the statements as substantive evidence against the defendants. We cannot assume that the judge limited this evidence to the narrow purpose of weighing credibility." (268 Cal.App.2d at p. 777.) We think that this assumption is sound. It not only conforms to the well settled rule that a statute "is presumed to be constitutional until the contrary appears," (*Fox etc. Corp.* v. *City of Bakersfield* (1950) 36 Cal.2d 136, 141 [222 P.2d 879]; see *Sacramento Municipal Utility Dist.* v. *Pacific Gas & Elec. Co.* (1942) 20 Cal.2d 684, 693 [128 P.2d 529]; *Hart* v. *City of Beverly Hills* (1938) 11 Cal.2d 343, 348 [79 P.2d 1080]) but it also is in accord with the instant record which shows neither that counsel asserted the unconstitutionality of section

[10]Berta's hearsay statement was inconsistent with her testimony as a defense witness, although it was not inconsistent with that portion thereof on cross-examination wherein she stated that she did not *recall* making her prior statement. (See *People* v. *Sam* (1969) *ante*, pp. 194, 210 [77 Cal.Rptr. 804, 454 P.2d 700].) In *Sam*, unlike the instant case, the witness' prior statement was not inconsistent with *any* testimony at the subsequent trial.

?35 nor that the court even considered that the section might ? invalid. If the court felt that the section was unconstitu-?onal, presumably it would have so stated for the record. In ?e absence of such statement we cannot assume that the ?urt did not follow the law. There was thus error in giving ?erta's prior inconsistent statement substantive use.

█ The People have failed to show that the error was ?armless to defendant "beyond a reasonable doubt." (*Chap-?an* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, ?10, 87 S.Ct. 824] ; *People* v. *Johnson, supra,* 68 Cal.2d at p. ?60.) Berta's hearsay statement concerned conduct of defend-?nt on the night of the killing. Berta was the only witness ?ho gave testimony as to the events immediately preceding ?he killing and her account thereof was substantially in ?ccord with that of defendant and was strong evidence that ?mily was the aggressor on May 5. As previously noted, the ?efense was a claim of self-defense and it is extremely rele-?ant to a determination thereof as to who was the aggressor in ?he altercation. (See *People* v. *Lew* (1968) 68 Cal.2d 774, 779 ?69 Cal.Rptr. 102, 441 P.2d 942].) Berta's hearsay statement ?as the only evidence of the events of May 5 which made ?efendant out to be the aggressor.[11] Such evidence of aggres-?ion by defendant at a time proximate to Emily's death ?'strikes directly at the heart of the defense." (*People* v. *Ireland* (1969) 70 Cal.2d 522, 532 [75 Cal.Rptr. 188, 450 P.2d 580].) Although, as the Attorney General contends, the ?ourt *may* have found that Emily was in fact the aggressor ?but nevertheless rejected defendant's claim of self-defense, there is a "reasonable possibility" (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 710]) that the court accepted Berta's hearsay statement as true and on the basis thereof found defendant to be the aggressor. The possibility that Berta's statement contributed to defendant's conviction

[11]Contrary to the Attorney General's contention, Berta's hearsay statement was neither introduced to rebut evidence of defendant's good character nor was it merely cumulative of other evidence of defendant's stormy relationship with Emily. Rather, the statement concerned defendant's actions during the continuous period of quarreling just prior to the killing (see fn. 4, *ante*) and, it appears to us that it was introduced to offset Berta's testimony given on direct examination which tended to show that Emily was the aggressor. Officer Cerin of the Bakersfield Police Department testified that he arrived at the cafe at 2:20 a.m. and, as previously indicated, defendant and Emily first began to quarrel at 2:05 a.m. Since the validity of a claim of self-defense is a question of fact (*People* v. *Davis* (1965) 63 Cal.2d 648, 654 [47 Cal.Rptr. 801, 408 P.2d 129]), any evidence of threats made by defendant toward Emily during that 15-minute period tended to show that defendant was the aggressor and was thus highly relevant on the issue of self-defense.

compels us to hold the error prejudicial. We must therefo[r]
reverse the judgment.

One of defendant's other contentions warrants our atte[n]
tion for the guidance of the court upon retrial.

■ Defendant claims that a statement made by Emily o[n]
May 4 to one of her friends, Mary Banda, was improperl[y]
admitted at trial. Called as a witness for the prosecutio[n]
Mary testified on direct examination, over defendant's obje[c]
tion, that on May 4, Emily had told her: "Bridges [Mary'
nickname], I am breaking up with Gerry [defendant] tonigh[t]
I might get killed over it but I am going to do it."

Defendant argues that the statement was inadmissible hea[r]
say and was irrelevant to any issue in the action since ther[e]
was no question as to what Emily intended to do on the nigh[t]
of May 4. The Attorney General argues that the statemen[t]
was admissible to show Emily's "state of mind at the time o[f]
her death, i.e., that she feared the appellant because of he[r]
extreme jealousy." To this extent reliance is placed on sec
tion 1250, the so-called state-of-mind exception to the hearsa[y]
rule.[12] To be admissible under that section the evidence mus[t]
be offered (1) to prove the declarant's state of mind when i[t]
is itself an issue in the action or (2) to prove or explain acts
or conduct of the declarant.

At the outset we note that Emily's statement is hearsay a[s]
that evidence is defined in section 1200.[13] The evidence wa[s]
not offered to prove "whether certain things were said or
done [without regard] to whether these things were true or
false" (*People* v. *Henry* (1948) 86 Cal.App.2d 785, 789 [195
P.2d 478]), but rather was offered "to prove the truth of the
matter stated" (§ 1200, subd. (a)), i.e., that the statements
were in fact true and being so, indicated Emily's true state of

---

[12]Section 1250 provides: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

(2) The evidence is offered to prove or explain acts or conduct of the declarant.

(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

[13]Section 1200 provides: "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.

(b) Except as provided by law, hearsay evidence is inadmissible.

(c) This section shall be known and may be cited as the hearsay rule."

nd. (See *People* v. *Ireland, supra,* 70 Cal.2d at p. 529.), hearsay it was inadmissible unless it came within the state-mind exception to the hearsay rule as asserted by the torney General.

As in *Ireland,* the declarant Emily's state of mind is not elf an issue in the action thus eliminating subdivision )(1) of section 1250 as the basis of admissibility of the tement. (See *People* v. *Ireland, supra,* 70 Cal.2d at p. 9.) The remaining ground of admissibility is, therefore, bdivision (a)(2) of that section, i.e., that the statement was offered to prove or explain acts or conduct'' of Emily. The ttorney General urges in support thereof that defendant's claim of self-defense required the trier of fact to find that ther the victim was the aggressor or that the [defendant] ed excessive force in defending herself. The evidence em-bodied in the testimony [pretrial statement] of the [defend-nt] and the corroborating testimony of Mrs. [Berta] Swain as strong proof that the victim was the aggressor at the time e was stabbed. In rebuttal, it was entirely proper for the rosecution to show that the victim was apprehensive on the ay of her death and not likely to be aggressive toward the defendant].'' We believe that this analysis is correct and rovides a proper basis for the admission of Emily's hearsay atement.

The issue of self-defense had been raised by defendant both t the preliminary hearing, the transcript of which was made art of the evidence at trial, and by defense counsel's opening tatement to the court. It was thus proper for the People to ntroduce evidence that defendant was the aggressor. Rea-onably interpreted, Emily's statement that ''I might get illed over it . . . .'' expresses her fear that defendant might ecome violent once Emily broke up with her. From this fear could be inferred that Emily was not the aggressor and that n fact defendant attacked Emily. As we said in *People* v. *Lew, supra,* 68 Cal.2d at page 779:[14] ''Or had defendant laimed self-defense, he would have placed Karen's [the vic-im's] state of mind at issue[15] since a claim of self-defense

___

[14]Although *Lew* involved a trial which occurred prior to the effective ate of the Evidence Code, we there stated that section 1250 ''is in all ssential respects a codification of the common law then existing in this urisdiction.'' (68 Cal.2d at p. 781, fn. 3.) It is thus a reliable guide o the proper application of section 1250. (See *People* v. *Ireland, supra,* 0 Cal.2d at p. 531, fn. 7.)

[15]We pointed out in *Ireland* that the description in *Lew* of Karen's tate of mind being in issue is technically inaccurate. (*People* v. *Ireland, supra,* 70 Cal.2d at p. 530, fn. 6.)

requires the trier of fact to find that the other party was [
aggressor, the prosecution, through rebuttal testimony, cou[
have shown that *Karen was apprehensive and not likely to*[
*aggressive.* Her fear would then have been a factor proper[
before the factfinder in its deliberations on the defendan[
claim of self-defense.'' (Italics added.) (Citing *People*[
*Atchley* (1959) 53 Cal.2d 160, 172 [346 P.2d 764].)

Our determination herein also is in accord with what [
recently said in *Ireland* with respect to the application[
section 1250. In that case the trial court permitted the pro[
cution to introduce the hearsay statement of the victim th[
''I know he's [defendant] going to kill me. I wish he wou[
hurry up and get it over with. He'll never let me leave,''[
being relevant to rebut an alleged inference that the deceas[
was the aggressor. We held that the admission of that hears[
statement was error because ''the defense *did not raise a[
issue of fact* with respect to [the deceased's] conduct imm[
diately preceding her death. The undisputed evidence . [
established that [the deceased] was reclining on a couch wh[
she was shot by defendant.'' (Original italics.) (70 Cal.[
at pp. 530-531.) Unlike *Ireland,* the claim of self-defense in t[
instant case raises a question of fact with respect to Emily[
conduct on May 5, i.e., whether or not she was the aggresso[
and therefore her statement is admissible ''to prove or expla[
[her] acts or conduct.''[16] (§ 1250, subd. (a)(2).)

■ Section 1252[17] provides that a hearsay statemer[
otherwise admissible under section 1250 is inadmissible [
made under circumstances indicating its lack of trustworth[
ness. Defendant contends that circumstances surrounding *th[
testimony of Mary Banda* indicate that *such testimony* w[
untrustworthy. In making this contention defendant miscor[
ceives the meaning of section 1252. That section has referenc[
to the *statement made by the hearsay declarant,* Emily herein[
not to the testimony of the witness who relates the hearsa[
statement to the trier of fact. (See *People* v. *Lew, supra,* 6[
Cal.2d at p. 780.) The determination in the instant case i[

[16]There is no need for us to attempt to separate Emily's statement [
into two separate, distinct and independent sentences. In the light o[
the circumstances and manner in which they were made we construe he[
statement that she was going to break up with defendant as merely [
statement of her reasons for fearing defendant, thus making both sen[
tences admissible as one statement of her state of mind under section[
1250.

[17]Section 1252 provides: ''Evidence of a statement is inadmissible[
under this article if the statement was made under circumstances such a[
to indicate its lack of trustworthiness.''

...s whether there is "at least circumstantial evidence that [the statements] [of Emily] are probably trustworthy and [cr]edible." (*Ibid.*)

It was said in *People* v. *Hamilton* (1961) 55 Cal.2d 881, 895 [3 Cal.Rptr. 649, 362 P.2d 473], that "the declarations, [includ]ing those of a present existing state of mind, made in a [na]tural manner and not under circumstances of suspicion, [ca]rry the probability of trustworthiness." In the instant case [de]fendant has not directed our attention to anything in the [re]cord indicating that Emily made the statement to Mary [Ama]nda in other than a natural manner. No motive for Emily [to] lie has been shown and in light of the past relations be[tw]een defendant and Emily it was not unreasonable for the [la]tter to foresee a possibility of violence on the part of [de]fendant. Nothing, therefore, indicates that Emily's state[m]ent was untrustworthy and it was therefore admissible [un]der section 1250.

Defendant further asserts that even if Emily's state[m]ent was admissible under section 1250, "there would be a [se]rious question whether its use is now sanctioned by our [ju]dicial policy in view of the view expressed recently by the [S]upreme Court in *Johnson.*" As previously indicated, in *Johnson* we held that section 1235 is unconstitutional in a [cr]iminal case because it deprives the defendant of the Sixth [A]mendment right to confrontation. We thus prohibited the [su]bstantive use of a witness' prior inconsistent statement al[th]ough we did not restrict its use for impeachment purposes. There is no basis for defendant's conclusion that our deter[m]ination that section 1235 is constitutionally defective neces[sa]rily implies that all exceptions to the hearsay rule are [p]lagued by the same constitutional infirmity. Each of the his[to]rical exceptions stands upon valid and long-honored prin[c]iples. The hearsay rule as adopted in this country has [?]always involved the idea of exceptions, and the constitution[m]akers indorsed the general principle merely as such. They [d]id not attempt to enumerate exceptions; they merely named [a]nd described the principle sufficiently to indicate what was [in]tended. . . ." (5 Wigmore on Evidence, *op.cit. supra,* at [§] 1397, pp. 130-131.) Our decision in *Johnson* does not indi[c]ate a "judicial policy" that is opposed to the hearsay excep[t]ions (Cf. *People* v. *Green, supra,* 70 Cal.2d at p. 664.) [D]efendant has not attempted to demonstrate wherein the evi[d]ence admitted under section 1250 in the instant case contains [t]hose infirmities found by us to be present in *Johnson,* and we

948

do not feel compelled to undertake *sua sponte* a detail analysis of the validity of the well established state-of-mi exception.

The attempted appeal from the verdict is dismissed; t judgment is reversed.

Traynor, C. J., Peters, J., and Tobriner, J., concurred.

MOSK, J.—I dissent.

Before discussing the problem of applying *People* v. *Joh son* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111] the instant facts, I feel compelled to point out that the hea say testimony in question should not have been admitted f any purpose, and thus the *Johnson* error should not ha occurred. As we emphasized recently in *People* v. *Sam* (1969 *ante,* p. 194 [77 Cal.Rptr. 804, 454 P.2d 700], prior stat ments may be admitted under Evidence Code section 12 only if they are in fact *inconsistent* with trial testimony. N such inconsistency appears from the record in this case.

The majority concede (in fn. 10) that Berta's hearsa statement was not inconsistent with her testimony on cros examination that she did not recall making the prior stat ment.[1] This concession is compelled by *Sam,* which (at 210) makes it clear that a witness who has no present recolle tion of past events is not impeached, nor is testimony othe wise inconsistent, which indicates at an earlier time and in different place he related the events.

The majority do find an inconsistency between Berta direct examination as a defense witness and her hearsay de laration. I submit, however, that a line-by-line reading of he testimony (fn. 9) fails to support the majority's suppositio that she said the victim, Emily, was the aggressor. Bert merely testified she heard a glass break, that Gerry's hair wa wet, that she "saw them struggling together," that Gerr asked for assistance, that Emily was "getting the best of th struggle," that "they seemed to settle down," and tha "Emily turned around and went out the door." It is pur conjecture to conclude from the fact Emily was winning th fight and Gerry asked for aid that Emily necessarily had bee

---

[1]Despite the concession, however, it appears from the record far mor likely that Lillian Moreno's testimony was improperly admitted as bein "inconsistent" with Berta's direct cross-examination testimony as t lack of recollection—a not uncommon mistake also made by the trial cour in *Sam*—than as being inconsistent with her equivocal direct testimony The majority attempt to create in the direct testimony an inconsistenc which neither the trial court nor the parties appear to have had in mind

he original aggressor. Just as likely this could be, in the words of Thomas Hardy, "aggressive fancy working spells pon a mind o'erwrought." Indeed, to the everlasting good ortune of mankind, the brutes, bullies and aggressors of the pecies often miscalculate their prowess and do not prevail.

Finding no direct contrariety in terms between the prior tatement and the court testimony, the majority then fall back pon two cases decided more than 50 years ago to support heir thesis that the inconsistency may be related to a *tendency* to contradict not merely the testimony but "any inference to be deduced from it." This is strong medicine to use in rationalizing admission of hearsay testimony. Over the half entury that has elapsed since *Hanton* v. *Pacific Elec. Ry. Co.* (1918) 178 Cal. 616 [174 P. 61] and *Worley* v. *Spreckels Bros. Commercial Co.* (1912) 163 Cal. 60 [124 P. 697] were decided, the law of evidence in general has undergone considerable development, and the law governing prior inconsistent tatements in particular has assumed constitutional dimensions. It is disconcerting to see those outdated and dubious principles exhumed and given new and undeserved vitality in. the majority opinion, especially since they add nothing to the reasoning or outcome of the decision.

Regardless of the existence of an inconsistency, there was error under *Johnson*. The majority appear to have correctly assumed that the trial court—rightly or wrongly—did in fact admit Lillian Moreno's testimony as a prior inconsistent statement, and did give some substantive effect to that testimony. Thus it is of no consequence to which testimony the court applied the prior statement as inconsistent, or whether an objection to the lack of inconsistency would properly have been sustained.[2] If the testimony was admitted and considered by the trial court under section 1235, it is in that light we must review it. The fact that the testimony might have been inadmissible for any purpose does not justify or mitigate its improper and unconstitutional admission for substantive purposes under section 1235, and cannot alter the conclusion that *People* v. *Johnson* applies. Thus it is totally unnecessary for us to search for an actual inconsistency, so long as the trial court acted on the assumption that an inconsistency existed.

---

[2]The lack of a timely objection might preclude raising on appeal any issue relating to the admission and use of the prior statement for *impeachment* purposes (see *People* v. *Sam, supra*); but as the majority point out, no objection was required in this pre-*Johnson* case to the *substantive* use of the testimony.

950

But in any event the applicability of *Johnson* to this ca
does not require a reversal of the judgment, for as we said i
*Johnson* (at p. 660), "the erroneous admission of such
statement as substantive evidence does not automaticall
deprive the defendant of a fair trial, and the conviction wi
be reversed only in those cases in which prejudice ensued.
Applying the test of *Chapman* v. *California* (1967) 386 U.S
18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824], I would find th
use of the prior inconsistent statements here challenged to b
"harmless beyond a reasonable doubt."

Manslaughter is the unlawful killing of a human · bein
without malice. (Pen. Code, § 192.) It is voluntary man
slaughter when the killing is "·upon a sudden quarrel or hea
of passion." (Pen. Code, § 192, subd. 1.)

The legal guidelines which govern a determination o
whether a killing constitutes voluntary manslaughter hav
been frequently delineated. (*People* v. *Brubaker* (1959) 5
Cal.2d 37, 44 [346 P.2d 8] ; *People* v. *Borchers* (1958) 5
Cal.2d 321, 328 [325 P.2d 97].) In *Borchers* the court foun
that the victim had roused the defendant "to a heat of 'pas
sion' by a series of events over a considerable period of time
. . ." The court noted that "passion" need not mea
"rage" or "anger," but it "may be any 'Violent, intense.
high-wrought, or enthusiastic emotion.' [Citations.]" The
court then pointed out that " 'the fundamental of the inquiry
[in determining whether a homicide is voluntary man-
slaughter] is whether or not the defendant's reason was, at
the time of his act, so disturbed or obscured by some pas-
sion—not necessarily fear and never, of course, the passion
for revenge—to such an extent as would render ordinary men
of average disposition liable to act rashly or without due
deliberation and reflection, and from this passion rather than
from judgment.' " The *Borchers* court found that the evi-
dence "supports a finding that defendant killed in wild des-
peration induced by [the victim's] long continued provoca-
tory conduct." (P. 329.)

Whether the defendant's reason was obscured by a passion
which would lead or compel an ordinary person of average
disposition to act rashly and without due deliberation and
reflection is a question of fact and is not to be ascertained de
novo on appeal. The examination on appeal is limited to a
determination of the legal adequacy of the evidence. If the
circumstances properly justify the judgment, the opinion of a
reviewing court that those circumstances might also reason-

ably be reconciled with the innocence of the defendant will not warrant interference with the factual determination of the trial court. (*People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778].) Here, upon ample evidence, the trial court rejected the theory of self-defense and found that the killing was not accidental. Even though from a different vantage point the evidence is susceptible of exculpatory inferences, we do not enjoy the privilege of substituting our interpretation for that reached by the trier of fact.

Contrary to the impression given by the majority opinion (*ante,* p. 935), there was little disparity in the size of the two women. The victim was about 5 feet 2 inches tall and weighed approximately 120 pounds; the defendant is approximately 5 feet 3 inches tall and weighs about 110 pounds. From its inception the unnatural relationship between the defendant and the victim was marked by violence. On at least three occasions defendant assaulted the victim with knives; in two of those episodes defendant cut an intervening party, and on the third occasion the victim was also cut. At still another time the defendant assaulted the victim with a hammer and on several occasions made threats to take the life of the victim or to "get her."

While the evidence also indicates the victim committed numerous assaults upon the defendant, employing weapons on occasions and using her hands or throwing objects at other times, the tumultuous history alone would suggest that the killing here qualified as manslaughter: it occurred "upon a sudden quarrel or heat of passion." It is undoubtedly with the stormy relationship of the parties in mind that the prosecutor did not seek a conviction of murder but merely of manslaughter. The circumstances appear to justify no greater leniency.

The questioned testimony of Lillian Moreno related to whether the defendant broke a beer bottle and told the victim she "was going to get her with it." It must be remembered, however, that the breaking of the beer bottle and the initial altercation between the parties took place earlier—the precise time span being unclear—than the ultimate fight and stabbing. There was a definite interlude between the two incidents and a cooling off period ensued; the victim turned her back and withdrew from the room in which the fight had taken place. Neither Berta's testimony nor that of Lillian Moreno referred to the subsequent episode culminating in the death.

Therefore, their testimony is of little value in assessing culpability for the later killing.

Indeed, if we rely entirely upon the defendant's version of the events, the evidence of manslaughter is overwhelming. She admitted that she was tired and nervous at the time of the stabbing, that the victim's aggressive and violent conduct preceding the stabbing had placed her in fear of the victim, that she was distraught over the fact that the victim was leaving her for another woman. The trial court could properly conclude from this combination of weariness, nervousness, fear and jealousy that the defendant's reason had been displaced by passion and that she stabbed the victim under circumstances justifying criminal responsibility.

The trial judge was not compelled by the disputable evidence to accept the defendant's assertion of accident. The physical evidence alone strongly rebuts the claim of an accidental killing: the nature of the weapon, a butcher knife with an eight-inch blade; the severity of the wound, a six-inch penetration into the body of the victim; the force necessary to pierce the abdomen that deeply. And finally, the victim at no time had a weapon in her possession. Thus even if the defendant was, in accordance with her contention, acting in self-defense, the trial court could properly conclude that the force used by the defendant far exceeded any amount reasonably necessary to defend herself.

In *People* v. *Beach* (1963) 212 Cal.App.2d 486 [28 Cal. Rptr. 62], there was substantial evidence that the victim husband had beaten the defendant wife that day, choked her, grabbed her by the hair and threw her into another room; she had marks on her neck, showing evidence of choking. Nevertheless, the reviewing court refused to substitute its judgment for that of the trier of fact and held that "the trial court could reasonably conclude that defendant was roused to a heat of 'passion' by the series of events transpiring before the fatal shooting." The evidence was held to support the finding by the trial court that defendant killed upon a sudden quarrel and heat of passion. This court denied a hearing.

Similarly, in *People* v. *Welborn* (1966) 242 Cal.App.2d 668, 672 [51 Cal.Rptr. 644], the evidence indicated the victim was intoxicated, ordered the defendant wife out of the house, arose from a chair and acted in a belligerent manner and on previous occasions had physically abused defendant. She was "frightened, nervous and tense," and claimed she did not intend to fire the gun at the victim. Nevertheless, the trier of

fact found her guilty of voluntary manslaughter, the Court of Appeal affirmed the conviction, and a hearing was denied in this court.

Here, unlike *Beach* and *Welborn* in which a weak defendant took the life of an overbearing victim, the record indicates that the victim and the defendant frequently fought each other on a basis of physical equality. The defendant knew she could stand and fight it out with the victim because she had often done so. She won some battles and she lost some. Thus, there is totally absent from the record any indication that the defendant was genuinely concerned for her life or that she reasonably feared the infliction of great bodily harm at the time of the stabbing. Since the victim was concededly unarmed, it seems abundantly clear that the amount of force used by the defendant in wielding a lethal weapon far exceeded whatever force might have been necessary at the time to defend herself.

In short, the extrajudicial statement, even if it suggests that the victim may not have been the aggressor, was not a significant factor leading to the defendant's conviction. On the strength of the properly admitted evidence, primarily the defendant's own testimony, the trial court could find the defendant guilty regardless of who was the aggressor of the moment. The lethal weapon, the nature of the wound, the unarmed victim and the combative background of these women were not conducive to a finding either that the killing occurred accidentally or that the defendant used reasonable force in defending herself from assault.

Therefore, I would conclude that the error in admitting evidence contrary to *Johnson* was harmless beyond a reasonable doubt.

I would affirm the judgment.

McComb, J., and Burke, J., concurred.